**WATTERS et al. v. HAMILTON GAS CO.**
No. 2889.

District Court, S. D. West Virginia.
April 8, 1935.

Steptoe & Johnson, Stanley C. Morris, and W. E. Miller, all of Charleston, W. Va., for petitioners.

Frank Lively, of Charleston, W. Va., and Nathan A. Smyth, of New York City, for debtor.

McCLINTIC, District Judge.

This proceeding is before the court upon remand from the Circuit Court of Appeals for the Fourth Circuit, Hamilton Gas Co. v. Watters, 75 F.(2d) 176, for the purpose of taking evidence to determine the principal place of business of the debtor during the six months prior to the filing

of the petition herein. On June 7, 1934, immediately after the President signed the act amending section 77B to the Bankruptcy Act (11 USCA § 207), a petition was filed in this court by certain creditors proposing a reorganization of Hamilton Gas Company. The petition alleged that both the principal assets and the principal place of business of the debtor were in this jurisdiction during the preceding six months. On June 18, 1934, an answer was filed by the debtor resisting the approval of such petition on the ground, amongst others, that on June 9, 1934, the United States District Court for the Southern District of New York had approved a petition filed on June 8, 1934, by the debtor itself, seeking a reorganization under the same section of the act. The jurisdiction of the New York court was predicated on the allegation in the answer that the company had its principal place of business in that district during the six months' period prior to the filing of the petition. On June 21, 1934, this court, upon consideration of the petition and answer, entered its order approving the petition filed here and taking exclusive jurisdiction of the property of the debtor. Upon appeal to the United States Circuit Court of Appeals this order was reversed and the proceedings remanded for the purpose of determining whether the New York court had jurisdiction to enter its order of June 9, 1934. 75 F.(2d) 176, 182. The Circuit Court directed: "If it should be found that the principal place of business of the debtor during the six months preceding the filing of the petition was not in the Southern District of New York, then the New York Court had no jurisdiction to pass upon the petition, and the court below should retain jurisdiction. In re Continental Coal Corporation (C. C. A.) 238 F. 113."

Hamilton Gas Company is a corporation organized in December, 1927, under the laws of the state of Delaware and duly admitted to do business in the state of West Virginia. It owns directly leases and leasehold estates for oil and gas purposes covering 18,353 acres of land in West Virginia, improved by 84 producing wells, and 27,510 acres in Kentucky, improved by 55 producing wells, or a total of 45,863 acres of land, improved by 139 wells. It also owns the capital stock of Larner Gas Company, a corporation created under the laws of the state of West Virginia on August 13, 1928, which, in turn, owns leases and leasehold estates for oil and gas purposes covering 28,463 acres of land in West Virginia, improved by 164 producing gas wells. It also owns the capital stock of Thompson Gas Company, a corporation formed under the laws of the state of Delaware on December 1, 1927, which owns leases and leasehold estates for oil and gas purposes covering 8,623 acres of land in Clay county, W. Va., improved by 26 producing wells. It holds the capital stock of Harshbarger Gas Company, a corporation under the laws of West Virginia, formed in August, 1931, which owns the franchise and small utility plant supplying gas at retail to approximately ·500 consumers in the town of Milton, W. Va.

The debtor and its subsidiaries are engaged exclusively in the business of the production and sale of natural gas and oil in West Virginia and Kentucky. Access to the gas reserves is obtained almost exclusively by lease for such purpose from the owners of the mineral rights, usually owners of the fee, almost all of whom are residents of West Virginia and Kentucky and the great majority of whom actually live upon the leased premises. The business of the debtor consists of the development of the gas reserve by the drilling of wells, the laying of gathering lines and pipe lines from such wells to the pipe lines of the larger pipe line companies who purchase the gas at wholesale and remit monthly on the basis of meter readings maintained by them. All the sales of gas are at wholesale, except for the comparatively insignificant operations of Harshbarger Gas Company. The production and sale of oil constitutes less than 1 per cent. of the debtor's business.

The debtor has outstanding first mortgage 6⅛ per cent. bonds in the principal amount of $2,325,500, with interest accrued since December 1, 1931, unsecured 6⅛ per cent. debenture notes ·in the principal amount of $756,000, with interest accrued thereon since December 1, 1931, claims of general creditors to the extent of approximately $278,500, preferred stock in the amount of 1,684 shares of the par value of $100 per share, and common stock in the amount of 925,079 shares of the par value of $1 per share. Its subsidiary Larner Gas Company has outstanding first mortgage 7 per cent. notes in the principal amount of $300,000, with interest accrued thereon since September 11, 1931. All the capital stock of Thompson Gas Company is owned by the debtor and pledged with trustees under the indenture of mortgage securing the debtor's first mortgage bonds. All the properties of

Thompson Gas Company are located in Clay county, W. Va., and mortgaged by supplemental indenture to secure the debtor's bonds. All the gas produced from these properties is sold to the debtor, who, in turn, resells the gas to Hope Natural Gas Company at wholesale. All the stock of Larner Gas Company is owned by the debtor, and all its properties are located in West Virginia and subject to a mortgage securing $300,000 of 7 per cent. notes held by United Fuel Gas Company. Larner Gas Company owes the debtor $968,860.46 for advances made by the debtor for the purchase of properties and their development. All the stock of Harshbarger Gas Company is owned by the debtor or its subsidiary, Larner Gas Company.

Section 77B (11 USCA § 207) provides that the petition for reorganization shall be filed "with the court in whose territorial jurisdiction the corporation, during the preceding six months or the greater portion thereof, has had its principal place of business or its principal assets, or in any territorial jurisdiction in the State in which it was incorporated." The first question to which the court must therefore address its attention is the meaning of the phrase "principal place of business" as used in the Bankruptcy Act. That meaning is to be determined by an application of the principles of statutory construction and the pertinent decisions under the Bankruptcy Act.

■ Ordinary proceedings in bankruptcy are proceedings in rem, authorized by the laws of Congress for the purpose of preserving assets and insuring the equitable distribution of the proceeds thereof for the benefit of creditors of insolvent debtors who are thereby discharged of their obligations and permitted to enter into economic relations free of liabilities. These purposes are likewise served by proceedings under section 77B, 11 USCA § 207, for, although that section is a portion of the chapter of the Bankruptcy Act dealing with relief of debtors, it can hardly be supposed that the intention of the Congress was entirely to reverse the ancient order of things, turn liabilities into assets, and permit debtors to retain their assets whilst being shorn of their debts. The distinguishing feature of proceedings under section 77B is that a method is devised whereby with the consent of two-thirds of those having equities in the property of the debtor a liquidation of the debtor's estate may be avoided and its business continued as a going concern. In this way, a reorganization of a corporation's finances may be accomplished without the expense and losses incident to a judicial sale.

■ When the fundamental character of the proceedings is so considered, it is plain that the "assets" and "business" spoken of in the act must be the "assets" and "business" owned by the debtor at the time the petition is filed, from which is to be derived the earnings with which to pay the creditors and other security holders interested in the debtor's business. It is that business which it is the purpose of section 77B to preserve as a going concern by so flexing the corporate obligations as to place the corporate debtor beyond the hazards of fixed charges and matured debts. The conclusion is inescapable that by vesting jurisdiction in the court where the principal place of business existed during the six months prior to bankruptcy, the Congress intended to refer to the business which the debtor was authorized by its charter to conduct and the finances with respect to which were intended to be reorganized.

In this connection it is worthy of note that a sharp distinction exists between the phrase "principal office" and the phrase "principal place of business." In the opinion of the Circuit Court of Appeals in this case, attention is called to the fact that "it may be found that the principal place of business of the corporation, within the meaning of the National Bankruptcy Act [11 USCA], has been the place in which the greater part of the business has actually been conducted, rather than the place where, for convenience, offices have been maintained." This distinction has been recognized in other cases involving this precise question. In Dryden v. Ranger Refining Co., 280 F. 257, 259 (C. C. A. 5th, 1922), the court said: "The business of a corporation is its activities in the acquisition or production of that which its charter authorizes it to produce or acquire, and its dealings with its customers, not its relations with its own employees or officers in its internal government, or in applying to them the checks it may have devised in carrying on its business as security against the improvidence or negligence of agents."

Likewise, in Continental Coal Corporation v. Roszelle Bros., 242 F. 243, 246 (C. C. A. 6th, 1917) the court observed:

"Nor as between the place where a mining corporation's actual operations are carried on and the place where the selling is

done and the principal office maintained can the latter be declared in all cases, as matter of law, the principal place of business. * * *

"We are impressed that the dominating feature of the bankrupt's business—that which gave it distinctive character—was the mining of coal. As was well said by Judge Cochran: 'It is the production end of his (the mine operator's) business that is the prominent feature and is expressed in his name. No one ever speaks of a manufacturer or mine operator as a merchant or seller of goods, but always as a manufacturer or mine operator.'"

Bearing in mind, then, that the business referred to in the act is the business in which the debtor was authorized by its charter to engage, and of which the finances are sought by these proceedings to be reorganized, we turn to review the evidence before us. It is complete, detailed, and specific, and almost without conflict as between the witnesses on each side. From its inception, all the gas and oil produced and sold by the debtor and its subsidiaries has been produced and sold exclusively in West Virginia or Kentucky and principally in the former state. Such production was almost wholly under leases granted by residents of those states, and drilling operations for the development of those leases and the production of gas were conducted in West Virginia or Kentucky and principally in the former state. All gathering lines and pipe lines purchased or constructed were located there. All meters for the measurement of gas and tanks for the measurement of oil were installed and maintained there. The entire field force which had charge of the maintenance of the wells and pipes lines and the drilling of additional wells was resident and employed there and supervised and directed from the office of the company at Charleston, W. Va. The general field superintendent in charge of field operations and the general manager were both residents of Charleston and had their offices there. It was testified by the president of the company that the general manager did not have authority to discharge employees without his assent, but it was also brought out in evidence that the general manager received a salary of $9,000 a year, and it is not likely that such salary would have been paid to one who was not vested with substantial authority in all matters and responsibility in many. The company's meter department, in charge of reading and correcting the meters used for the

measurement of gas, and its land department in charge of the numerous and protracted negotiations with lessors characteristic of the business, were both located in the offices of the company in Charleston. All materials and supplies necessary for the maintenance of the company's leases and wells, drilling, construction of pipe lines and general operations were purchased from dealers in Charleston, or elsewhere in West Virginia.

Considerable evidence was taken on the item of negotiations for the purchase of additional properties, as the holdings of the company, particularly through its subsidiaries, expanded rapidly during the years 1928, 1929, and 1930. The properties so purchased were principally small groups of wells and leases developed and owned by small independent operators resident in West Virginia. By a consistent policy of buying and developing, the smaller properties were put together in an effort to integrate them into groups of larger holdings which could be economically operated. The negotiations and consummation of the purchase of these properties were almost entirely conducted in West Virginia. The owner or owners of the wells and leases would approach the company at its offices in Charleston, or its president, who spent a great deal of his time in Charleston, and open negotiations for sale. A preliminary report on the property would be prepared in the Charleston office and given verbally to the president in Charleston, or by writing to him at New York. Upon instructions from him a more thorough examination of the properties would be made by employees from the Charleston office and usually at the same time an option would be prepared and its execution obtained by counsel at Charleston. If the examination of the properties was favorable, the option would be exercised, usually subject to examination of title, and counsel in Charleston would be instructed to make such examination. When the titles were in order, counsel would prepare the necessary deeds and other instruments of assignment for execution by the owners of the property, and the president in almost every instance came to Charleston, made payment of the purchase price to the owners of the property, and received delivery of the deeds.

The record also shows that the company maintained at great expense an office in New York City, where its president, Mr. W. A. Larner, resided. It maintained its main bank accounts in New York City and Balti-

more, Md.; although it also kept smaller accounts in Charleston, W. Va., banks and other banks in West Virginia and Kentucky. The company's main books of account were kept by its secretary-treasurer in New York, and a few of its contracts for the sale of gas were negotiated there, although most of its contracts were inherited from the owners of the properties to which they related. Most of the company's disbursements were made by checks issued from its office in New York and signed by its president or other corporate officer. There is also some evidence to the effect that the president, Mr. W. A. Larner, maintained strict supervision and control over the company's employees at Charleston, but as was said in the Dryden Case, supra, the business of the company did not consist of "its relations with its own employees or officers in its internal government, or in applying to them the checks it may have devised in carrying on its business as security against the improvidence or negligence of agents."

This was the manner in which the business of the debtor was conducted up to the month of January, 1932. From this relation of the facts, it is clear, in the language of the Circuit Court of Appeals, that the Southern District of West Virginia was "the place in which the greater part of the business" had "actually been conducted rather than the place where, for convenience, offices" were "maintained."

On January 18, 1932, a creditors' bill was filed in the District Court of Delaware seeking the appointment of receivers of the property and business of the debtor, and shortly thereafter similar bills were filed in New York, Pennsylvania, West Virginia, and Kentucky. Receivers were appointed in West Virginia on January 19, 1932, and in Kentucky on January 22, 1932. In West Virginia the receivership proceedings were extended to the debtor's subsidiary, Larner Gas Company, and receivers for that company were appointed on February 5, 1932. In all the orders appointing receivers of the assets, property, and business of these companies, the receivers were given "authority to take possession and charge of said assets, property and business and to continue said business as a going concern," and the officers of the companies were restrained from doing any business for them and from interfering with the operations of the receivers.

On August 18, 1932, the trustees under the indenture of mortgage securing the first mortgage bonds of the debtor intervened in the receivership proceedings in West Virginia, filed a bill for the foreclosure of the mortgage, and asked for the appointment of receivers. Shortly thereafter ancillary foreclosure proceedings were instituted in the District Court for the Eastern District of Kentucky and receivers were appointed there by order recognizing the jurisdiction of the West Virginia court as the court of primary jurisdiction and administration and of principal decree. The orders appointing receivers of the mortgage assets conferred upon them the same powers as were previously granted in the creditors' proceedings. The foreclosure bill filed in West Virginia extended the receivership proceedings to the Thompson Gas Company, all of whose properties were subject to the lien of the mortgage securing the debtor's bonds. Shortly thereafter, foreclosure bill was also filed by the trustees under the indenture of mortgage securing the first mortgage notes of Larner Gas Company.

At the time of the appointment of receivers, the financial condition of the company was so deplorable as to indicate that every possible device to avoid receivership had been exhausted. The company had only $59 cash in bank, and all the income from its major sales contracts, and the contracts of the subsidiary, Larner Gas Company, had either been pledged for the repayment of indebtedness or had been prepaid in anticipation of future deliveries of gas. The receivers, therefore, not only had no cash with which to continue the company's operations, but the immediate income from the sale of gas, which might otherwise have been expected during the first three or four months of receivership, was beyond their reach. At the same time taxes on the properties were in default in both West Virginia and Kentucky, undeveloped leases were in jeopardy of cancellation for failure to pay delay rentals, and royalties on its wells, and even essential miscellaneous operating expenses, including charges for public utility services, were long past due. With the exception of the president, Mr. W. A. Larner, who had prepaid to himself salary in the amount of $27,000 in excess of the amount due him prior to receivership, and who had paid personal bills with company checks in the amount of approximately $1,900 which had not been repaid to the company, no wages, salaries, or expenses had been paid to the employees, either in the field or in the office, since November, 1931. The entire maintenance and

operation of the company's properties were threatened with breakdown, and its expenses were running far in excess of its actual income from the sale of oil and gas.

On instructions from this court, the receivers in West Virginia immediately proceeded to effect economies which would bring the company's operating expenses within its income. By the surrender of speculative leases which the company could not possibly develop prior to expiration, by a general campaign in collaboration with the other major operating companies in the territory for the reduction of delay rentals on leases and gas well rentals on small wells, and by the reduction of personnel and of miscellaneous operating expenses of all kinds, the business was placed upon a basis under which it could continue to operate without increasing its debts. The New York office, which had been maintained at an expense as high as $75,000 per year (including a salary to Mr. W. A. Larner of $30,000 per year) in the years prior to receivership, was discontinued so far as the operation of the company's business was concerned. By means of these economies the receivers paid off the pledged and prepaid income of approximately $100,000 due at the time of receivership, and accumulated $325,000 in cash by June 7, 1934.

After January 20, 1932, when the receivers qualified by filing bond, the operation of the debtor's business was controlled exclusively from its office in Charleston, W. Va. All the producing properties of the company were located in West Virginia and Kentucky, and all the business of the production and sale of natural gas and oil was conducted there; and, by leave of the court in the Eastern District of Kentucky, the Kentucky receivers maintained their offices and transacted their business at Charleston. The receivers occupied the same floor space in the Kanawha Valley Building at Charleston as was previously used by the company, although they obtained a reduction of rental to $100 per month. All payments for gas were received and receipted for at that office, and all payments of rentals, royalties, wages, salaries, taxes, and other operating expenses were made by checks of the receivers prepared and issued from that office. All money coming into the receivers' hands was deposited in the Kanawha Valley Bank, including, by order of the Kentucky court, the money received by the Kentucky receivers. Mr. W. A. Larner, who had been appointed a receiver in New York and Delaware, refused to send to Charleston the company's general books of account which were in New York, on the ground that such books were in his custody as receiver of the Delaware court, but the West Virginia and Kentucky receivers opened and maintained their own books of account in Charleston and made monthly reports to the courts in West Virginia and Kentucky of all their receipts and disbursements. From the Charleston office the receivers prepared and filed all the tax returns for gross sales taxes, corporate license taxes, direct property taxes, and federal income taxes, and made remittance for such taxes accordingly. Employees in the field, meter, land, and office departments were continued at the office in Charleston under the supervision of the receivers, and from that office was directed all the maintenance and repair work done on the property, all improvements of wells, laying of pipe line, preparation of maps and surveys, compromise of existing lawsuits, extensive and protracted negotiations with lessors for the reduction of rentals, the proper payment thereof and the renewal of leases, the preparation of the numerous contracts and agreements necessary to give legal effect and binding character to the economies introduced, the purchase of all materials, supplies, and equipment used and useful in the operation of the company's properties; in short, all the activities which made up the business of the production and sale of gas which the debtor was organized to carry on.

During the statutory period here in question, from December 7, 1933, to June 7, 1934, the date of the filing of the petition herein, the evidence is uncontradicted that the business of the debtor was in the exclusive and complete control of the West Virginia and Kentucky receivers at Charleston, W. Va. During that period the receivers reduced the rental on 42 wells, acquired 10 rights of way, and renewed 11 leases. Approximately 1,500,000,000 cubic feet of gas were sold, mostly in West Virginia, to the major pipe line companies. Most of these companies, and certainly all the important ones, including Hope Natural Gas Company, Godfrey L. Cabot, Inc., United Fuel Gas Company, and West Virginia Gas Corporation, maintain their operating offices in Charleston, W. Va., and with them the receivers dealt for the company with respect to all questions relating to the sale of gas and the performance of the company's contracts. All the gas purchased under

the gas purchase contracts of the debtor was purchased from individuals or companies located at Charleston or nearby points. All income from the debtor's properties and the properties of its subsidiaries Larner Gas Company and Thompson Gas Company was received and receipted for by the receivers at Charleston and deposited in the Kanawha Valley Bank. The combined deposits of the receivers increased from $207,750.72 on December 7, 1933, to $325,222.06 on June 7, 1934. All payments made in connection with the business, including rentals, royalties, gas purchases, salaries, wages, taxes, supplies, repairs, and miscellaneous operating expenses were made by voucher checks issued and signed by the receivers at Charleston. The receivers maintained and preserved all the books and records relating to the business which were maintained anywhere during the period. They prepared all the tax returns with respect to the business, supervised all maintenance and repair work, prepared maps for use in connection with the intervention in the suit against Inland Gas Corporation in the District Court for the Eastern District of Kentucky, and discharged in creditable fashion every duty which the executive officers of a corporation engaged in similar business would have discharged.

Counsel for the debtor do not contend that the business of the debtor was conducted by it from New York during the statutory period, nor even that the debtor engaged in any business during that period. Indeed, any other position would seem to place the debtor in contempt of the New York court, as the evidence at the hearing included a copy of the order of the United States District Court for the Southern District of New York entered on January 18, 1932, appointing receivers of the debtor in that jurisdiction, and that order specifically enjoins the debtor from engaging in any business or interfering with the receivers in their operation of the debtor's business.

The contention seems to be made, however, that after receivership the debtor maintained an office in New York. The facts in the record are that after receivership was instituted, and the receivers of this court had properly decided that the New York office previously maintained by the company was unnecessary and the cost of maintaining the office was improper, as it served no useful function in the practical operation of the properties, Mr. W. A. Larner nevertheless continued to occupy the office in the Greybar Building in New York, which the company had previously maintained. Mr. Larner, however, had been appointed receiver by the courts of Delaware and New York, and, although the company had no producing properties and no income in those jurisdictions, Mr. Larner had stationery printed naming himself and his co-receivers as the occupants of the office in the Greybar Building. Later, during the year 1933, he filed a sworn petition with the Delaware court setting up his activities as receiver, pointing out that between January 18, 1932, and the date of his petition, he had spent 186 days outside of these offices in travel as receiver of that court, and averring that all his time had been spent in the business of the receivership. In such petition he also claimed as receivership obligations all the expenses of maintaining the office in the Greybar Building, including service charges, telephone and telegraph, and the salaries of such clerical help as he had kept about him there. Subsequently a claim was filed in this jurisdiction for the payment of such expenses, as well as fees as Delaware receiver. At the hearing in this proceeding every item of expense alleged by Larner to have been made for the company in maintaining the New York office was shown upon cross-examination to have been included as expense incurred by him as receiver in Delaware. Thus the mantle of the Delaware receivership, which was donned for the purpose of justifying the allowance of expenses by this court in the equity proceeding, is now doffed for the more convenient mantle of president of the company in order to give color to the claim that the company maintained a place of business in New York during the statutory period. The inconsistency between these positions is so apparent as to make the conclusion inevitable that the witness conceived his own activities to be nothing more nor less than the principal business of the debtor.

From the evidence introduced at the hearing this court finds that the principal place of business of the debtor prior to receivership was in West Virginia and within the jurisdiction of this court, and that such principal place of business did not cease to be such because the debtor's affairs were in the control of equity receivers in West Virginia during the period of receivership, including the statutory period from December 7, 1933, to June 7, 1934, the six months prior to the filing of the petition

herein. The court is of the opinion and so rules that this case, on the facts as well as law, is squarely within the principles announced by the United States Supreme Court in Royal Indemnity Co. v. American Bond Co., 289 U. S. 165, 53 S. Ct. 551, 77 L. Ed. 1100. In that case the contention was made that because the business of the corporation was being operated by equity receivers the corporation ceased to have its principal place of business in the jurisdiction in which such receivers were appointed. The court said:

"The decree in equity and its execution by officers of the court did not change the ownership of the assets or of the business. *The corporation continued to have the only business owned before the appointment of receivers,* though the actual conduct of its operations was for the time being vested in the court's appointees." 289 U. S. page 168, 53 S. Ct. 553.

"Until a winding up had been effected the business formerly conducted by the company in Chicago continued to be the respondent's business and not that of another, and the place where that business was conducted, *whether by receivers or by the corporate officers, still remained the 'principal place of business,' in the common acceptation of the phrase.*" 289 U. S. page 169, 53 S. Ct. 553. (Italics ours.)

To the same effect are the cases cited by the Circuit Court of Appeals in its opinion: In re Monarch Oil Corporation (D. C.) *272 F. 524;* In re American & British Mfg. Corporation (D. C.) 300 F. 839; In re Consolidated Gas Utilities Co. (D. C.) 8 F. Supp. 385.

We revert again to the fundamental principles of statutory construction involved in this proceeding. The Bankruptcy Act vests jurisdiction in the court where the principal place of business of the debtor is located. In view of the fact that the purpose of section 77B, 11 USCA § 207 is to permit the prompt and economical reorganization of finances, can there be any doubt that the "business" referred to is the business which the corporation is organized to engage in and to which the finances to be reorganized relate? Can there be any doubt, as applied to this debtor, that the business referred to is the business of the production and sale of natural gas and oil which is still owned by the debtor and which has always been conducted principally in this jurisdiction, whether by officers of the company or by equity receivers appointed

as officers of this court? The construction contended for by the debtor and its counsel is artificial. It has no substantial relation to the problem involved or the purposes to be accomplished in this proceeding. Counsel for the debtor in their brief assert that the "distinction between principal office and principal place of business has no basis either in common usage or in the decided cases," apparently overlooking the opinion of the Circuit Court of Appeals in this proceeding and also the authority of Dryden v. Ranger Refining & Pipe Line Co., 280 F. 257 (C. C. A. 5th, 1922); Continental Coal Corporation v. Roszelle Brothers, 242 F. 243 (C. C. A. 6th, 1917); and In re Tygarts River Coal Co., 203 F. 178 (D. C. N. D. W. Va., 1913); and other authorities of like character. Familiar as this court is with the property, assets, and business of this company, it is difficult to visualize how the business could be principally carried on elsewhere than in West Virginia where the major portion of its properties are located. The business is confined solely to the production and sale of natural gas and oil. Access to the mineral reserves, which is fundamental in the doing of any such business, is obtained by lease agreements with lessors who are farmers and landowners, resident, almost without exception, in West Virginia and Kentucky; and it is impractical, if not impossible, to deal with these people elsewhere. The drilling of wells, their maintenance and repair, the laying of pipe lines and the metering of gas must of necessity be conducted where the gas is produced and sold. Material, supplies, and equipment, used in comparatively small quantities, must be purchased from local supply houses which can give immediate delivery within easy reach of the properties. All the gas is sold and delivered to larger pipe line companies in West Virginia and Kentucky, most of whom have their headquarters or operating offices in Charleston, W. Va. It may be that at one time the president of the company had his offices in New York and there received and disbursed the company's money, kept its books, and engaged in the sale of stocks and bonds, but can any one doubt that the situs of the business of the company was in the nature of things principally in West Virginia? Can any one doubt that the situs of that business remained in West Virginia when its control passed into the hands of equity receivers? And can there be any doubt at all that the intention of the Congress in vesting jurisdiction at the principal place

of business must have been to vest such jurisdiction at the situs of the business to be reorganized? The artificial and unsubstantial position taken by the counsel for the debtor, which would regard the activities of the executive officers of the corporation as the corporation's business, and the corporate personality as the alter ego of its president, has no relation to the purposes sought to be accomplished by the enactment of section 77B. The purpose of that legislation was not the relief of executive officers of defunct corporations in the hands of equity receivers, but the modification of strict legal obligations in such manner as to permit businesses to continue as going concerns. There can be no question but that the business intended to be relieved by these proceedings was located during the six months prior to the filing of the petition principally within the jurisdiction of this court.

At the outset of the hearing on this matter the debtor moved this court to stay further proceedings on the ground that the United States District Court for the Southern District of New York had entered its order finding that the principal place of business of the debtor was within its jurisdiction and that this question was, therefore, res judicata and not subject to collateral attack. Careful examination of the opinion of the Circuit Court of Appeals in this matter, however, discloses that if in fact the principal place of business of the debtor during the six months preceding the filing of the petition was not in the Southern District of New York, then the court in that district had no jurisdiction to pass upon the petition, and could not create such jurisdiction by finding such fact and making it binding upon the parties. This question was squarely raised and squarely decided in In re Continental Coal Corporation (C. C. A.) 238 F. 113.

There is, however, another aspect to this question which should not be disregarded. It will be recalled that at the time of filing of the petition herein the administration of the property, business, and affairs of the debtor and its principal subsidiaries had been conducted by this court for nearly two and one-half years. A great deal of the time and effort of this court and its officers had been consumed in placing the affairs of the company in a position where a reorganization of its finances was feasible. An order of reference to a special master had been entered and most of the tedious labor of ascertaining the company's assets and liabilities had been completed, and, in fact,

the report of the special master was shortly thereafter filed. In order to obtain the benefit of these preparations and to effect a prompt and economical reorganization of the debtor's affairs, the committees representing the company's creditors instituted proceedings under section 77B on June 7, 1934. It appears from the evidence at the hearing that on the next day similar proceedings were filed in the Southern District of New York in the name of the debtor, by its president, Mr. W. A. Larner. On June 9, 1934, an ex parte order was obtained from that court purporting to continue the debtor in possession of its properties, and restraining receivers, among others, from interfering with such possession, although in fact those properties had been in the possession of equity receivers for nearly two and one-half years and were still in the possession of such receivers; trustees not yet having been appointed by this court. When the New York court was apprised of the facts, the ex parte order was modified by order of June 26, 1934, restraining the debtor and its officers from interfering with the operations of the property or business by receivers of this court or those appointed to succeed them.

At the hearing, upon cross-examination, Mr. W. A. Larner testified that both before and after June 7, 1934, his activities had been devoted to opposing the reorganization proposed by the creditors' committees. It appears from a letter of June 15, 1934, from his counsel, Mr. Smyth, to Mr. Harper, chairman of the bondholders' committee, that his real objection to the plan of reorganization was the provision whereby the control of the new company's voting trust would be vested in representatives of the bondholders and creditors, a provision which would not assure him of the return of the properties to his management. His activities in opposing the plan consisted principally in voluminous letters to the creditors and other security holders and the customers of the company, denying, among other things, the authority of the officers of this court to administer the business and property of the debtor, although the New York court had specifically enjoined interference with them. After this court entered its order of June 21, 1934, approving the creditors' petition, an appeal was prosecuted to the Circuit Court of Appeals and the proceedings in New York were delayed upon a reference to a special master to take testimony. Immediately upon the announcement that the order of this court had been

reversed by the Circuit Court of Appeals, Mr. Larner, by letter of January 10, 1935, immediately advised all creditors, security holders, and customers that by such reversal jurisdiction over the property and affairs of the debtor was vested in the New York court, a statement which again brought in question the authority of the officers of this court in the administration of the properties, and resulted in serious delays in the collection of income from the sale of gas by the trustees. At the hearing, counsel for the debtor quite frankly stated that when the opinion of the Circuit Court of Appeals was made public some days later, it was regarded as the crack of a starting gun in a race between this court and the New York court for adjudication as to the location of the principal place of business of the debtor during the statutory period. Counsel for the debtor promptly obtained a report from the special master in New York upon one day's notice to counsel for the committees. Shortly thereafter, on February 15, the New York court entered an order finding in favor of its own jurisdiction. In the meantime, attempts had been made to obtain a stay of proceedings in this court under the mandate issued pursuant to the decision of the Circuit Court of Appeals of January 9, 1935. The order of the New York court of February 15, 1935, was obtained ex parte and contained provisions purporting to continue the debtor in possession, similar to the order of June 9, 1934, and enjoining the parties from proceeding in this court. On February 16, this order was resettled upon application of counsel for the committees so as to permit a continuation of the administration of the properties of the debtor by the trustees of this court and the prosecution of these proceedings by the parties.

This court does not feel that it was the intention of the Circuit Court of Appeals to initiate any such unseemly scramble for the control of the reorganization of this company, nor that the law will encourage such scramble by giving any efficacy to the principles of res judicata or collateral attack in such a situation. The requirement that the petition in a proceeding under section 77B (11 USCA § 207) be filed at the principal place of business of the debtor, in the absence of other jurisdiction, is in itself strictly jurisdictional, and the improper finding of fact by another District Court cannot operate as a bar to jurisdiction over a prior proceeding filed in this court.

This court is not eager to retain jurisdiction over the reorganization of this debtor; but it does feel that the reorganization could be most promptly and economically carried out here. Much evidence was introduced at the hearing, and counsel dealt, at considerable length in their brief, with regard to the question as to the jurisdiction in which the best interests of all the parties would be subserved. At the hearing on July 11, 1934, held for the purpose of determining the propriety of appointing trustees, even more detailed evidence on this question was introduced. Counsel for the debtor argued that the best interests of the parties require that these proceedings be removed to the Southern District of New York as a more convenient court for the individual bondholders and debenture holders to appear in. But it should be borne in mind that section 77B provides that the best interests of the parties rather than their convenience is decisive. As was said by the court in the case of In re Consolidated Gas Utilities Co., 8 F. Supp. 385, 387 (D. C. Del., 1934), "The test of transfer under section 77B is not convenience only but the best interests of all the parties. Many considerations besides convenience enter into the determination of that question." It is a well-known fact in corporate reorganizations that individual bondholders and other creditors cannot protect their interests by individual appearances and action. It is only through the union of their strength in committees authorized to act for all that they are able to retain the counsel and make the investigations essential to a proper consideration of any plans of reorganization. This fact was known to the Congress at the time of the enactment of section 77B and is recognized by the provisions of that section which give the court control of such committees and authorize the recognition of proper expenses incurred by them in the reorganization. In this proceeding a very large majority of the bondholders and debenture holders and other creditors are represented by the committees which prosecuted these proceedings. A numerical majority of the other classes of creditors not represented by these committees are resident in West Virginia and Kentucky.

It is evident that the creditors and other security holders of the debtor can look only to the property and business of the debtor for the salvation of their investments. At the hearing counsel for the debtor brought out the fact that the debtor's first mortgage

bonds were selling at 25 per cent. of their par, without regard to accrued interest, and after more than three years' experience in the administration of the business this court knows that even with the utmost economy possible the business cannot possibly pay off the indebtedness against it. A prompt reorganization is essential to the welfare of debtor and creditor alike. All the evidence with respect to the rights of the parties and their priorities which was introduced in the equity foreclosure proceeding, including the report of the special master, is available and has in fact been made a part of the record in this proceeding, and the same special master has filed a report in this proceeding which supplies the specific and detailed information necessary to pass upon the plan of reorganization here proposed. From its experience this court is familiar with the value of the debtor's properties, their income, and their prospective earning capacity. These facts appear to this court to outweigh by far the convenience of the individual bondholder in asserting his individual right.

In their brief counsel for the debtor have placed emphasis upon allowances to be claimed by the committees as an issue in this case, but they may rest assured that this court will scrutinize with the utmost care all requests for fees or allowances in this proceeding. Economy in the administration of the debtor's business by this court, which has been far greater than that of the debtor itself prior to receivership, is an earnest of this fact. Indeed, it is evident from the evidence introduced at the hearing that the real objection urged in the name of the debtor to the plan of reorganization proposed by these committees is the provision that the voting control of the reorganized company's stock, and, consequently, the management of the business, upon reorganization will be vested in representatives of the creditors rather than in the management prior to receivership. The knowledge which this court has of the history of the company and its condition at the time of receivership, the possibilities of its business under economical administration as disclosed during the period of receivership, and its prospective earning capacity, will enable this court to give far more attentive consideration to this objection than can be given by the District Court in New York where these facts are completely unknown.

An order may be prepared in accordance with the terms of this opinion.