In the Matter of VILLAGE MEN'S
SHOPS, INC., Debtor in
Possession.
No. IP 58–B–232.

United States District Court
S. D. Indiana,
Indianapolis Division.
March 18, 1960.

Bamberger & Feibleman, Indianapolis, Ind., for debtor and debtor in possession.

Jack B. Kammins, Indianapolis, Ind., for creditors committee.

Jack I. Kahn, Indianapolis, Ind., for certain petitioning creditors.

STECKLER, Chief Judge.

This proceedings is before the district court for review of the referee's order confirming the plan of arrangement and in respect to objections filed by the petitioners to certain acceptances. The petitioners are Commercial Factors Corporation, Chief Apparel, Inc., and Goodstein Bros. & Company, Inc.

On petition for review the orders of the referee may not be disturbed by the district judge unless such orders are clearly erroneous. 2 Collier on Bankruptcy (14th ed.), p. 1499; General Orders in Bankruptcy, No. 47, 11 U.S.C.A. following section 53.

Chapter XI makes no specific provision for disqualifying a claim for the purpose of determining the requisite majority of acceptances. See 8 Collier, supra, ¶ 5.-23, pp. 498–499. Thus the court will consider the petitioners' arguments in respect to the manner of obtaining, and the nature of the acceptances, in conjunction with the requisites for confirmation as provided by 11 U.S.C.A. § 766.

There are four requisites to confirmation under § 766 which the bankruptcy court must be satisfied exist before the arrangement may be confirmed. A proceedings under Chapter XI is not strictly an adversary proceedings, but the court must exercise *independent judgment*, no matter how large a majority of creditors accept the arrangement. In order to analyze the petitioners' arguments on review, they will be taken up in relation to the requisites of § 766.

The first requisite is that the provisions of Chapter XI have been complied with. According to the record (Volume 9, Transcript) [hereinafter parenthetical references to certain volumes relate to the Transcript], the original notice of the first meeting of creditors was mailed September 5, 1958 wherein the following dates were fixed:

First meeting of creditors — September 22, 1958
Application for confirmation — September 26, 1958
Hearing on confirmation — September 29, 1958

Actually, the application for confirmation was not filed until October 13, 1958, and the hearing on confirmation and objections thereto was held on November 6, 1958. The plan of arrangement was formerly confirmed on December 5, 1958. On September 29, 1958, there was a continued first creditors' meeting and the plan was declared accepted, but no new date was set for filing the application for confirmation or for the hearing on confirmation. The referee announced that October 14 would be the continued first meeting. On October 14, the referee set

November 6 for the hearing on objections to the confirmation. There is no showing that written notices were sent out in this regard.

Ten days' notice to creditors is required for the hearing on confirmation (11 U.S.C.A. §§ 94, 792), however this can be combined with the notice of the first meeting and it may be continued in open court without a further notice. 8 Collier, supra, ¶ 9.16, p. 1165, states that apart from serious statutory violations § 766(1) "should not be construed to bar confirmation whenever there has not been strict compliance with the provisions of Chapter XI." The postponement on September 29 was somewhat ambiguous (Volume 4, pp. 33–35), and perhaps notices should have been sent out. However petitioners were present at all meetings, and it is difficult to see how they could be prejudiced from a lack of written notice. As heretofore stated, notice was given at the October 14th meeting, setting the date for November 6, 1958. In view of the record, it can hardly be doubted that there was confusion as to when the hearing on confirmation was to be had (Volume 5, pp. 24–26); but it is significant that the petitioners did not raise this point until July 22, 1959— seven months after confirmation. I hold, therefore, that in view of such delay on the part of the petitioners, they cannot now complain.

Subsection (2) of § 766 provides that the court shall confirm an arrangement if satisfied that "it is for the best interests of the creditors and is feasible."

Petitioners contend that the plan of arrangement was not for the best interests of the creditors and that it was not feasible. In support of this argument they claim that the debtor made a $3,000 voidable preference to Windsor Village Shopping Center, Inc. [hereinafter referred to as "Windsor Village"] on back rent which could be recovered in a liquidation proceedings for the benefit of the general creditors. They further assert that the debtor was still losing money and immediate liquidation would preserve available assets; that the notes executed under the plan were not secure because the debtor would still have heavy secured debts and liabilities to creditors who waived deposit; and also that such notes were not secure even if signed by the officers because the officers had little or no assets.

"Best interests of creditors" is broadly interpreted to require a comparison between what creditors would receive under the arrangement and what they would receive in a liquidation of the estate. 8 Collier, supra, ¶ 19.17, p. 1167. The requirement that an arrangement be feasible is derived from former § 77B. It views the probability of actual performance of the provisions of the arrangement. 8 Collier, supra, ¶ 9.18, p. 1171.

The referee went into this matter quite thoroughly. It does not appear from the record that the creditors would get substantially more on liquidation, even if the $3,000 preference were recovered. Further, the referee seems to have been favorably impressed by the debtor's vice president, Gerald A. Rapoport. The judgment of the referee that the notes could properly be paid and the business saved, with court supervision, does not appear to be "clearly erroneous."

Subsection (3) of § 766 provides that the court shall confirm an arrangement if it is satisfied that "the debtor has not been guilty of any of the acts or failed to perform any of the duties which would be a bar to the discharge of a bankrupt."

Here the petitioners claim that the debtor failed to keep adequate books and records to explain a reduction in net worth of about $140,000 from March 5, 1957 to August 28, 1957. Such a failure on the part of the debtor under 11 U.S.C.A. § 32(c) (2) would be a bar to a discharge of a bankrupt.

It is also alleged that the debtor obtained credit by making and publishing a materially false financial statement to Goodstein Bros. & Company, Inc. on July 30, 1957 and to Phoenix, Inc. somewhat earlier. Likewise, if this were so, it would be a bar to a discharge of a bank-

rupt as provided in 11 U.S.C.A. § 32(c) (3).

Petitioners further contend that Gerald Rapoport made a materially false statement upon examination at the first meeting of creditors in that he falsely stated that no arrangements had been made with Windsor Village respecting its claim.

██ The law seems to be well settled that in order to sustain a bar to a discharge in bankruptcy, a wrongful intent or conscious wrongdoing is necessary. See Schweizer v. City Loan Co., 7 Cir., 1959, 271 F.2d 95. As to the alleged wrongful acts on the part of the debtor or Rapoport, intent is a question of fact. Rapoport attempted to explain the reduction in net worth (Volume 3, p. 61). The referee accepted his explanation. As to the alleged perjury on the part of Rapoport, the only evidence as to when the negotiations with Windsor Village began is the testimony of Rapoport that they had not begun on September 22–23, 1958 (Volume 1, p. 65; Volume 2, pp. 13–15). In this regard, I find the record is not sufficient to warrant a reversal.

Subsection (4) of § 766 provides that the court shall confirm an arrangement if it is satisfied that "the proposal and its acceptance are in good faith and have not been made or procured by any means, promises, or acts forbidden by this title."

Petitioners argue that the acceptances were not procured in good faith. In support of their argument they set up substantially the following:

(a) Some of the acceptances were obtained by personal solicitation by the debtor and its attorneys before the examination of the debtor and without a full disclosure.

(b) Saul G. Tobin obtained a power of attorney over some seventeen accounts upon false representation that a creditors' committee had been formed and without full disclosure.

(c) The landlords were a separate class of creditors and had received a voidable preference.

(d) Attorneys for the debtor obtained proof of claim of Fit-Rite Sports Headwear Co. and inserted the name of its attorney, Charles E. Barker, as having power of attorney, who accepted the plan without knowledge of the partners.

(e) The schedule lists American Fletcher National Bank and Trust Company as a creditor, but in fact the debt [$8,000] was transferred to debtor's attorneys and then assigned to Allied Merchants Corp. which then waived deposit and agreed to act as purchasing and financing agent for the debtor.

A review of the record discloses substantially the following: Rapoport testified that the bank was paid by Harry B. Reich, a relative, of Bayside, Long Island (Volume 2, pp. 3–7). It is noted that Rapoport had trouble remembering the relative's name until refreshed by counsel. Rapoport testified that Reich received no consideration and that he thought the note was assigned to Reich. It was news to Rapoport that the note had been assigned to his counsel, Bamberger & Feibleman. On September 25, attorney Sigmund Beck reported that Allied Merchants Corp. had agreed to finance $40,000 worth of merchandise for the debtor at six per cent (Volume 3, p. 25). On September 29 the referee announced that the plan had been accepted by the majority in number and amount. On October 13, Allied Merchants Corp. filed a proof of claim on the $8,000 debt as assignee of American Fletcher National Bank and Trust Company for "full value and consideration," and waived deposit. At that time it did not file an acceptance. An affidavit of the debtor stated that the officers had agreed to pay the full amount of indebtedness from their individual earnings over an indefinite period. Also, in the event Allied Merchants Corp. assumed the indebtedness to Harry B. Reich for monies deposited to consummate the plan of arrangement, the debtor would execute a chattel mortgage on fixtures and inventory, subsequent to confirmation, which mortgage would be junior to the notes of the creditors and which indebtedness

would not be paid off until the notes were satisfied.

In respect to the argument that the acceptance of Windsor Village was procured by means, promises and acts forbidden by the Bankruptcy Act in that an agreement was entered whereby it would waive deposit in return for conveyance of certain property (office equipment in the defunct Windsor Village store and an air conditioner at Meadows Shopping Center), and notes signed by the stockholders and their wives for twenty-five per cent of the amount claimed, or $7,200, payable one year after confirmation, the record substantially establishes the following:

On September 23, 1958, Windsor Village filed a proof of claim of $29,708.34 and also an acceptance. Eighteen thousand dollars ($18,000) of this claim was for anticipatory breach of its lease. Rapoport testified on September 22, 1958 (Volume 1, p. 65), and on September 23, 1958 (Volume 2, pp. 13–15) that no negotiations or agreements had been commenced with Windsor Village pertaining to the claim. On October 17, 1958, the debtor filed objections to the allowance of Windsor Village's claim to the full amount. On October 31, on hearings on objections to claims, Sigmund Beck, attorney for the debtor, announced that the above agreement had been reached in settlement of the objections. On November 6, 1958, the referee announced that an order would be entered confirming the plan of arrangement as amended and modified. However he stated, "I am not taking into account any proposed stipulation, and I think I should say, very fairly and practically, to all of you, this court will be very reluctant to approve any agreement which this debtor may contemplate, to give any unsecured creditors an advantage which other unsecured creditors are not receiving." (Volume 7, pp. 96–97.) On December 5, 1958, the referee approved a stipulation which set the Windsor Village claim at $15,000 (Volume 8, p. 26).

In determining whether the proposal of a plan of arrangement under Chapter XI and its acceptance are in "good faith," the specific inquiry should be whether, under the circumstances of the case, there has been an abuse of the provisions, purpose, or spirit of the chapter in the proposal or acceptance of the arrangement. 8 Collier, supra, ¶ 9.20, p. 1204, citing American United Mutual Life Ins. Co. v. City of Avon Park, 1940, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91. But whether the proposal of the arrangement is in good faith may be determined not only from conditions existing when the petition was filed, but also from subsequent acts. Ibid., citing In re Tinkoff, 7 Cir., 1936, 85 F.2d 305, certiorari denied 299 U.S. 611, 57 S.Ct. 314, 81 L.Ed. 450.

Acceptances may be obtained by the debtor before or after filing, and the manner in which acceptances were obtained may be considered in determining good faith. 8 Collier, supra, ¶ 5.23, pp. 492–499. In determining the requisite acceptances, Collier states:

"If otherwise entitled to be considered, claims which have been allowed and acceptances which have been filed before the conclusion of the meeting [first creditors' meeting] must be considered in determining the requisite acceptances. A determination of requisite acceptances at any particular meeting therefore cannot be final unless the meeting is concluded, instead of being adjourned." 8 Collier, supra, ¶ 9.05, p. 1139.

For the purpose of this review, I conclude there is not a sufficient record upon which to reverse the referee regarding the proposal of the plan and the acceptance therefor. From the evidence before the court it cannot be said as a matter of law that there was bad faith in the solicitation and acceptance of the plan.

The contention that the landlords were treated as a separate class of creditors and had received a voidable preference does not appear to be supported by the record; they are treated as general unsecured creditors who will be affected by

the agreement. Likewise, the allegations that the attorney for the debtor obtained the proof of claim of Fit-Rite Sports Headwear, Inc. and inserted the name of attorney Barker as having power of attorney, and that the acceptance of the plan was without knowledge of the partners, are not proved by the evidence.[1] The partner who actually signed the authorization was not called to testify. It would, therefore, be poor speculation on the part of the district judge to conclude that the referee was clearly erroneous in his findings in this regard.

As to the claim of Allied Merchants Corp. in the amount of $8,000, the record shows that this creditor never accepted the plan but proof of claim and waiver were filed on October 13, 1958. According to the authorities (see 8 Collier, supra, ¶ 9.05), it would appear that this claim and those of Louis and Gerald Rapoport should have been counted in number and amount in arriving at the required acceptances since they were filed before the conclusion of the first creditors' meeting, which, as pointed out, was adjourned to October 14, 1958. However, even if this is done, the plan would still have the requisite number and amount of acceptances. The entire transaction with regard to the bank's claim appears to be a part of the attempt to keep the debtor in business by providing a means of receiving merchandise. The affidavit of the treasurer of Allied Merchants Corp. stating it is an assignee for full value is uncontroverted. Upon this record a conclusion of bad faith certainly is not compelled.

The matter requiring the closest scrutiny here on review is the treatment accorded the claim of Windsor Village, the largest creditor. There can be no doubt from the evidence that there were negotiations between the debtor and Windsor Village whereby the latter, if the negotiations had been consummated, would have had a different arrangement than that accorded the others. There can

be no doubt that the Bankruptcy Act forbids different treatment of creditors in the same class. Thus, if the evidence were sufficient to establish that the acceptance of Windsor Village was procured by such means, or promises, confirmation could not be ordered. However the record does not support such a conclusion. As far as the record shows, there had been no promises or negotiations prior to the time the acceptance of Windsor Village was filed on September 23. (Volume 1, p. 65; Volume 2, pp. 13–15—Testimony of Rapoport.) The evidence most favorable to the debtor is that the negotiations were begun only after objections to the claim of Windsor Village were filed and were in the nature of a compromise of the objections. The proposed "compromise" was not consummated and not included in the plan of arrangement. Subsequently the claim was reduced to $15,000 and apparently treated as any other general creditor's claim (Volume 8, p. 26). In view of this, I conclude that it cannot be said as a matter of law that the *proposal* and *acceptance* were not in good faith or that they were procured by forbidden means.

Though the record falls far short of reflecting a proceedings commanding immediate approval, nevertheless it is not such as to require reversal of the referee's actions.

The referee's order of December 5, 1958 confirming the plan of arrangement is hereby sustained and the request of the petitioners that said order be set aside is denied.

From the record it is impossible to determine whether in the bankruptcy court a complete transcript of the evidence or only a summary, or partial transcript was to be filed in this review as allowed by local rule B–18(a). When the matter first came before me, only a segment of the evidence had been transcribed and submitted. From such transcript it was impossible for the court to

---

1. The record discloses that the claim was for $71. One partner, Gerstein, testified that they were willing to forgive the debt and that he did not know Barker. However the authorization of Barker was signed by Zimmerman, the other partner.

make an appropriate review. Accordingly, a complete transcript was ordered. Even as of this date, a small portion of the transcript has not been furnished. It is felt, however, that the missing portion would not alter the decision herein.

In view of the district court having ordered the full transcript, fifty per cent of the cost will be taxed against the petitioners on review and fifty per cent thereof will be taxed as costs in the estate.