Opinion for the Court filed by Senior Circuit Judge ROBB.
ROBB, Senior Circuit Judge:
In these consolidated cases the District Court reversed in part decisions of the Bankruptcy Court refusing to confirm Chapter 13 debt adjustment plans filed by appellees Wavalene N. Barnes and Abel Montano. The trustees in bankruptcy appeal, urging us to reinstate the Bankruptcy Court’s decisions. Both plans provide that secured creditors or creditors holding cosigned debts receive full payment of the amounts owed them, but that other creditors receive only nominal payments. The central issue on appeal, a controversial question of bankruptcy law undecided in this circuit, is whether the “good faith” requirement for confirmation of personal bankruptcy plans under 11 U.S.C. § 1325(a)(3) bars approval of plans proposing only such nominal payments. We adhere to the traditional meaning of good faith and hold that section 1325(a)(3) does not require any particular level of repayment to unsecured creditors. We also consider the classification of claims, an issue raised by Montano as cross-appellant in No. 81-1825, and hold that Chapter 13 plans may generally classify unsecured debts based on the presence of a codebtor, but that Montano’s plan as presently drafted “unfairly discriminates” between cosigned and non-cosigned debts under 11 U.S.C. § 1322(b)(1). Finally, we consider venue issues raised by both Montano and Barnes, and hold that the Bankruptcy Court improperly transferred these cases to the districts in which the debtors’ domiciles are located.
Chapter 13 of the Bankruptcy Code, 11 U.S.C. § 1301 et seq. (Supp. IV 1980), permits certain debtors to repay all or a percentage of their debts out of future income according to a court-approved plan. Unlike liquidation or “straight” bankruptcy under Chapter 7, 11 U.S.C. § 701 et seq., Chapter 13 does not require the debtor to surrender all non-exempt assets for distribution to creditors. Instead, the debtor makes continuing payments to creditors over a three-to-five year period. 11 U.S.C. § 1322(c). Upon completion of the plan, the Chapter 13 debtor is entitled to a broad discharge of his obligations. 11 U.S.C. § 1328(a).
Before the plan can become effective, however, it must be confirmed by the Bankruptcy Court. Section 1325(a) sets out six criteria for confirmation as follows:
(a) The court shall confirm a plan if—
(1) the plan complies with the provisions of this chapter and with other applicable provisions of this title;
(2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;
(3) the plan has been proposed in good faith and not by any means forbidden by law;
(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;
(5) with respect to each allowed secured claim provided for by the plan—
(A) the holder of such claim has accepted the plan;
(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
(C) the debtor surrenders the property securing such claim to such holder; and
(6) the debtor will be able to make all payments under the plan and to comply with the plan.
11 U.S.C. § 1325(a). If all six requirements are satisfied, the bankruptcy court must confirm the plan. H.R.Rep.No. 95-595, 95th Cong., 1st Sess. 430 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.
This appeal encompasses two distinct Chapter 13 plans filed by two debtors, Wavalene N. Barnes and Abel Montano. In February 1980 Montano filed a debt adjust *13 ment plan with the United States Bankruptcy Court for the District of Columbia.[1] Montano is employed as a clerk at the World Bank in the District of Columbia and earns a net income of $948 per month. His plan listed expenses of $749 per month for himself, his wife, and one dependent child, leaving an excess of approximately $200 per month available for repayment of his debts. His unsecured indebtedness totalled $31,507, and there were no secured creditors. Montano’s plan proposed monthly payments of $200, the full amount available, to be applied as follows: (1) one hundred percent payments to the unsecured creditors with claims guaranteed by cosigners, totalling approximately $7,000; and (2) one percent payments to the remaining unsecured creditors, with claims totalling $24,500.
Before deciding whether the plan should be confirmed the Bankruptcy Court ruled that venue was proper only at the debtor’s domicile in Virginia, not at his place of employment in the District of Columbia. In re Abel Montano, Bankr. No. 80-00071 (Bankr.D.D.C. April 8, 1980) (unpublished memorandum opinion). Over Montano’s objection the court ordered that the case be transferred to the Eastern District of Virginia, but stayed the transfer pending appeal of the venue ruling. The Bankruptcy Court then proceeded to the merits, and on June 2, 1980 issued an opinion denying confirmation of Montano’s plan. In re Montano, 4 B.R. 535 (Bkrtcy.D.D.C.1980). The court ruled that in order to satisfy the “good faith” requirement of 11 U.S.C. § 1325(a)(3), the debtor must propose “a plan of meaningful repayment,” adding “[tjhe court, in determining ‘meaningfulness, will look at each plan on a case-by-case basis, weighing both the interests of creditors and the debtors in light of the rehabilitative goals of Chapter 13.” Montano, 4 B.R. at 539. The court concluded that Montano’s plan, offering one hundred percent repayment to creditors holding cosigned debts and only one percent to all others, “fails to propose meaningful repayment . . . . ” Id. The Bankruptcy Court also rejected Montano’s attempt to treat debts guaranteed by cosigners more favorably than non-cosigned debts, ruling “a plan may classify only on the basis of substantial similarity” between claims, and that the “mere existence of a co-debtor is not legally sufficient to justify separate classification.” Id. at 537. The court denied confirmation on both the “good faith” and classification grounds.
Wavalene Barnes, the other debtor in these appeals, filed her debt adjustment plan in December 1979. She is employed as a government secretary and earns $749 per month net income. Her monthly expenses total $658, leaving $91 in disposable income. Her debts are as follows: $3500 owed to the Treasury Federal Credit Union, secured to the extent of $1750 by the debtor’s automobile; a secured debt of $710 owed to the Marcy Avenue Homebuyers Association; and approximately $6250 in other unsecured debts, mostly credit card obligations. Under her plan, Barnes proposed to repay these debts at the rate of $91 per month, providing one hundred percent to the secured creditors but only one percent to the unsecured creditors.
*14 On April 25, 1980 the Bankruptcy Court ordered Barnes’ case transferred to the District of Maryland on the basis of improper venue, again staying the transfer pending final disposition of her appeal. In re Wavalene Barnes, Bankr. No. 79-00293 (Bankr.D.D.C. April 25, 1980) (unpublished order). On July 30, 1980 the Bankruptcy Court denied confirmation of Barnes’ plan. In re Wavalene Barnes, 5 B.R. 376 (Bkrtcy.D.D.C.1980). Relying on the earlier opinion in the Montano case, the court ruled that Barnes’ one percent repayment to unsecured creditors was not in “good faith,” even though Barnes was devoting her entire disposable income to the plan. The court also ruled that Barnes underestimated her expenses and would be unable to meet all the payments under the plan, thus failing the “feasibility” requirement of 11 U.S.C. § 1325(a)(6). The court concluded that confirmation should be denied and the proceeding converted to a Chapter 7 liquidation. Barnes, 5 B.R. at 379.
Both cases were appealed to the District Court. On April 22, 1981 the District Court reversed on the issue of good faith, stating “nothing in the Bankruptcy Code suggests that ‘good faith’ as used in section 1325(a) was intended to depart from the term's traditional meaning of honesty in fact or honesty of intention.” In re Wavalene Barnes, 13 B.R. 997, 999 (D.D.C.1981). The District Court concluded that Barnes’ plan “offered repayment to the maximum extent she honestly believed she was capable [and therefore] met Chapter 13’s good faith requirement.” Id. at 1000. As for Montano’s plan, however, the District Court agreed with the Bankruptcy Court that 11 U.S.C. § 1122(a) did not allow separate treatment solely on the basis that certain debts were guaranteed by a cosigner. Id. The District Court ruled that Montano’s classification also failed because it discriminated unfairly between unsecured creditors in contravention of 11 U.S.C. § 1322(b)(1). Id. Finally, on the venue issue, the District Court ruled that because the Bankruptcy Court proceeded to the merits of the debtors’ claims, the venue determination was moot and did not need to be addressed on appeal. Id. at 998.
I. “Good Faith” Under 11 U.S.C. § 1325(a)(3)
Chapter 13 was enacted in 1978 as part of a comprehensive revision of the Bankruptcy Act of 1898.[2] It replaced the wage earner’s provisions contained in Chapter XIII under the 1898 Act, as amended,[3] and modified prior law in many respects. Most important for our purposes here, Chapter 13 changed the procedure for confirmation of the debtor’s bankruptcy plan. Under Chapter XIII, a majority of unsecured creditors had to approve the debtor’s plan before a court could confirm it. See 11 U.S.C. § 1052 (1976) (repealed 1978). Chapter 13 eliminates unsecured creditor approval, and leaves the confirmation decision to the court pursuant to the six criteria in 11 U.S.C. § 1325(a) set out in the text above. See p. 195 supra.
Section 1325(a)(3) requires that the debt- or’s Chapter 13 plan must be “proposed in good faith and not by any means forbidden by law.” Bankruptcy courts divide sharply over the meaning of this “good faith” requirement in the context of Chapter 13 plans which offer low-percentage repayments to unsecured creditors.[4] Some courts, including the Bankruptcy Court here, interpret section 1325(a)(3) to require “meaningful repayment.”[5] See, e.g., In re *15 Iacovoni, 2 B.R. 256, 268 (Bkrtcy.D.Utah 1980); In re Hurd, 4 B.R. 551, 556 (Bkrtcy.W.D.Mich.1980). Such an interpretation is generally based on the legislative history and broad purposes of Chapter 13. Other courts, including the District Court here, hold that nothing in the Bankruptcy Code expressly contemplates a minimum payment requirement, and that section 1325(a)(3) requires nothing more than honest intentions. See, e.g., In re Scher, 12 B.R. 258 (Bkrtcy.S.D.N.Y.1981); In re Cloutier, 3 B.R. 584 (Bkrtcy.D.Colo.1980). As of this writing three circuit courts of appeals have considered the issue. In two of the cases, In re Goeb, 675 F.2d 1386 (9th Cir. 1982) and In re Rimgale, 669 F.2d 426 (7th Cir. 1982), both courts held that good faith could not be defined solely in terms of meaningful repayment, but that the amount of repayment was one factor that could be considered. In the third, In re Terry, 630 F.2d 634 (8th Cir. 1980), the court ruled that a plan proposing no payment whatsoever to any creditor was not in good faith.[6]
We conclude section 1325(a)(3) does not require any particular level of minimum repayment as a prerequisite to Chapter 13 plan confirmation. Our conclusion is based on the following reasons. First, looking to the structure of section 1325, only one provision, section 1325(a)(4), explicitly addresses amounts to be paid to unsecured creditors. Section 1325(a)(4) requires merely that unsecured creditors receive no less under the Chapter 13 plan than they would have in a liquidation under Chapter 7. The presence of an explicit standard in section 1325(a)(4) undercuts the idea that general “good faith” language in section 1325(a)(3) was intended to impose another, more rigorous standard governing the minimum amount payable to unsecured creditors.
Second, in drafting section 1325(a)(3), Congress used language virtually identical to that found in various sections of the 1898 Bankruptcy Act.[7] Although the case law is sparse, the few reported decisions mentioning “good faith” under prior law do so in the context of alleged debtor misconduct such as fraudulent misrepresentation, In re Norman Finance & Thrift Corp., 298 F.Supp. 336 (W.D.Okl.1969); nondisclosure of an agent’s financial interest in the proceeding, American United Mutual Life Ins. Co. v. Avon Park, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 (1940); improper solicitation of creditors to obtain their consent, In re Village Men’s Shops, Inc., 186 F.Supp. 125 (S.D.Ind.1960); failure to provide adequate security and to set aside voidable transfers, In re Stanley Karman, Inc., 279 F.Supp. 828 (S.D.N.Y.1967); or use of the bankruptcy proceeding to avoid child support payments, Gonzales Hernandez v. Borgos, 343 F.2d 802 (1st Cir. 1965). In short, “good faith” questions under pre-1978 law generally arose in cases of debtor misconduct in the implementation or approval of the plan, and did not relate to the contents of the plan.[8] This *16 is exactly what would be expected, since under Chapter XIII a majority of unsecured creditors were able to block approval of a plan that offered insufficient repayment, and most debtors proposed full repayment plans. See Report of the Commission on the Bankruptcy Laws of the United States, Part 1, H.R.Doc. No. 137, 93d Cong., 1st Sess. 160 (1973). Notwithstanding the differences between Chapter 13 and prior law, to interpret “good faith” as meaningful repayment would be to impose a definition radically different from the term’s meaning at the time Congress enacted section 1325(a)(3). We hesitate to create such a new definition without explicit instructions from Congress.
Third, we think the legislative history too inconclusive to say that Congress in 1978 intended a new standard of minimum repayment as a prerequisite to Chapter 13 confirmation. Isolated portions of the committee reports do support the policies behind a meaningful repayment standard,[9] but nothing in those excerpts connects meaningful repayment with the “good faith” requirement in section 1325(a)(3). Moreover, other portions of the legislative history negate a meaningful repayment standard as a general policy or purpose of Chapter 13.[10] At most, the legislative history suggests Congress expected Chapter 13 debtors to repay a substantial portion of their debts. We cannot conclude that Congress therefore intended to bar confirmation of Chapter 13 plans proposing less than “substantial” or “meaningful” repayment. If Chapter 13 as presently enacted does not achieve the results Congress anticipated, it is for Congress not the courts to correct the situation.
Finally, recent action in Congress supports adherence to the traditional definition of “good faith.” In 1980 the 96th Congress debated the Technical Amendments Bill which, among other things, would have added a “bona fide effort” test to section 1325(a)(4).[11] Similar versions of the bill *17 passed both the House of Representatives and the Senate, but the legislation was never enacted in final form.[12] The House and Senate disagreed on the precise meaning of “bona fide effort,” but both chambers agreed that “good faith” under section 1325(a)(3) was not intended to require a minimum percentage of repayment to unsecured creditors. Senator DeConcini, a leading sponsor of both the Technical Amendments Bill and the 1978 Bankruptcy Reform Act, noted:
[Jjudges have had to strain the provisions of Section 1325 by decision or informal rule to reach the right result vis-a-vis the level of payment of the debtor for the particular case.
Many courts have construed the good-faith language, Section 1325(a)(3) to this end, which was not intended by Congress in the enactment of that requirement.
126 Cong.Rec.S. 15,175 (daily ed. Dec. 1, 1980) (remarks of Sen. DeConcini); see also H.R.Rep.No. 1195, 96th Cong., 2d Sess. 24. Senator DeConcini further stated that the good faith requirement “is meant to bar the conformation of a Chapter 13 plan where the debtor either does not intend to effectuate the plan as proposed or where the proposed plan is for a purpose not permitted under Title 11,” citing as an example “any plan the principal purpose of which is to render the debtor incapable of meeting legal obligations for the support and maintenance of a former spouse or dependent child.” 126 Cong.Rec.S. 15,175 (daily ed. Dec. 1, 1980).
Although we must be cautious when dealing with legislative statements not contemporaneous with the provision in question,[13] an unequivocal statement of intent by a prime sponsor of the original legislation is quite persuasive here. Moreover, we must recognize that the Technical Amendments Bill represents an unsuccessful attempt by Congress to deal with the problem of nominal payment plans under Chapter 13. It seems inappropriate for courts to create a “meaningful payment” standard by interpretation and inference when Congress has failed to do so explicitly. In light of the Supreme Court’s ruling that the assignment of broad jurisdiction to bankruptcy judges is unconstitutional, Northern Pipeline Construction Co. v. Marathon Pipe Line Co., -U.S. -, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), it seems likely that Congress will reexamine the Bankruptcy Act once again. If Congress wishes to prohibit or restrict low-percentage Chapter 13 plans, it will soon have the opportunity to do so.
For the reasons given above we adhere to the traditional meaning of “good faith” as honesty of intention. It is not necessary that we provide a comprehensive definition of “good faith” today. No one has suggested that either Abel Montano or Wavalene Barnes has engaged in any specific misconduct, did not intend to carry out the plan, proposed the plan for an improper purpose, or did anything else to bring either case within the ambit of bad faith as traditionally interpreted. The Bankruptcy Court ruled that the plans were not in good faith under 11 U.S.C. § 1325(a)(3) solely on the ground that the plans offered a low level of repayment to unsecured creditors. We hold that section 1325(a)(3) does not prohibit such nominal payment plans and therefore affirm the District Court on the issue of good faith.
II.Classification of Debts
Montano’s Chapter 13 plan distributes his available monthly income so that creditors holding cosigned debts guaranteed by third parties receive one hundred percent pay *18 ment, while all other unsecured creditors receive only one percent of their claims. The trustee argues that this arrangement is an improper classification under 11 U.S.C. § 1322(b)(1). That provision states:
[T]he plan may . . . designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated ....
Section 1122, referred to in the language immediately above, reads in full as follows:
(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.
11 U.S.C. § 1122.
The Bankruptcy Court relied on section 1122(a) in rejecting Montano’s plan, holding that cosigned and non-cosigned debts are “substantially similar” and thus may not be separately classified. In re Montano, 4 B.R. at 537. The District Court agreed, adding that a plan which provides one hundred percent payment to creditors with cosigned debts but only one percent to other unsecured creditors unfairly discriminates between classes of creditors within the meaning of section 1322(b)(1). In re Wavalene Barnes, 13 B.R. at 1000.
We think the courts erred in holding that section 1122(a) prohibits classification based on the presence of a co-debtor. Section 1122(a) specifies that only claims which are “substantially similar” may be placed in the same class. It does not require that similar claims must be grouped together, but merely that any group created must be homogenous. See 5 Collier on Bankruptcy ¶ 1122.03[1][b] at 1122-6 (15th ed. 1982); accord, In re Gay, 3 B.R. 336 (Bkrtcy.D.Colo.1980); In re Kovich, 4 B.R. 403 (Bkrtcy.W.D.Mich.1980). Although some courts have held that section 1122(a) prohibits classification based on any criterion other than legal right to the debtor’s assets, see, e.g., In re Iacovoni, 2 B.R. 256, 260-61 (Bkrtcy.D.Utah), the plain language of the statute contradicts such a construction. Moreover, section 1122(a) so interpreted would conflict with section 1322(b)(1), which specifically authorizes designation of more than one class of unsecured creditor, each presumably with equal legal rights to the debtor’s estate. We therefore hold that section 1122(a) does not prohibit Montano from grouping his unsecured obligations according to whether or not a codebtor is present.
This does not mean Montano’s plan should be confirmed. Section 1322(b)(1) states that a plan may not “unfairly discriminate against any class . . . . ” The critical question is not whether Montano may group cosigned debts apart from non-cosigned, but whether his plan to pay one hundred percent to the first group “unfairly discriminates” against the second, which is to be paid only one percent.
Bankruptcy courts have interpreted unfair discrimination under section 1322(b)(1) in many ways without reaching a consensus. See 5 Collier on Bankruptcy ¶ 1322.-01[3][a] (15th ed. 1982) (Supp.Nov.1981). Clearly some difference in treatment between classes is permissible, or there would be little point in creating separate classes in the first place. The limits of permissible discrimination, however, are undefined. Montano argues that a plan does not violate section 1322(b)(1) so long as a rational basis exists for the classifications, and each class of unsecured creditor receives more than it would in a Chapter 7 liquidation. (Appellee’s Br. at 33). Some bankruptcy courts have applied similar criteria. See, e.g., In re Sutherland, 3 B.R. 420 (Bkrtcy.W.D.Ark. 1980). Nonetheless, we cannot agree with Montano’s formulation. Section 1322(b)(1) prohibits unfair discrimination, and an inquiry into fairness plainly involves more than the rationality of the debtor’s classifications or some minimum amount creditors must receive.
*19 What constitutes fair discrimination will vary from case to case, and we cannot offer a generally applicable definition. The court must examine the amounts proposed for each class in light of the debtor’s reasons for classification, and exercise sound discretion. See In re Gay, 3 B.R. 336 (Bkrtcy.D.Colo.1980). Considering the circumstances presented here, we think a ninety-nine percent differential in the amounts paid on cosigned versus non-cosigned debts is unfair. Montano argues that unless cosigned obligations are completely repaid, creditors can proceed against the cosigners, who in turn will put indirect pressure on Montano and interfere with the “fresh start” the Bankruptcy Code is supposed to provide. Filing a Chapter 13 plan, however, does not guarantee unqualified freedom from the pressures of bankruptcy. Nothing in the record suggests Montano will be unable to continue with his plan if eosigned obligations are not paid in full, and Montano raises no other factor that might justify departure from the basic principle that all unsecured creditors should be treated alike. Insulation of Montano from worry does not justify the unequal treatment he proposes.
We hold that Montano’s plan “unfairly discriminates” against unsecured creditors holding non-cosigned debts, and therefore violates section 1322(b)(1). As presently drafted the plan may not be confirmed pursuant to section 1325(a)(1), which requires that plans “comply with the provisions of this chapter and with other applicable provisions of this title . . . . ” If Montano chooses to modify his plan, the Bankruptcy Court must determine whether any difference in treatment between unsecured creditors is fair considering the circumstances and the debtor’s offered justifications.
III. Venue
Under the new Bankruptcy Code, the initial venue for filing of bankruptcy cases is governed by 28 U.S.C. § 1472 as follows:
Except as provided in section 1474 of this title, a case under title 11 may be commenced in the bankruptcy court for a district—
(1) in which the domicile, residence, principal place of business, in the United States, or principal assets, in the United States, of the person or entity that is the subject of such case have been located for the 180 days immediately preceding such commencement, or for a longer portion of such 180-day period than the domicile, residence, principal place of business, in the United States, or principle assets, in the United States, of such person were located in any other district; or
(2) in which there is pending a case under title 11 concerning such person’s affiliate, general partner, or partnership.
(footnote omitted).
Unlike prior law, section 1472 applies to all proceedings under the Bankruptcy Code, whether liquidation pursuant to Chapter 7 or rehabilitation under Chapters 11 or 13.[14] The Code further provides that a bankruptcy case filed where venue is proper may be transferred to another district “in the interest of justice and for the convenience of the parties.” 28 U.S.C. § 1475. When a case is filed “in the wrong division or district,” the bankruptcy court may retain the case or order transfer to any other district, again, “in the interest of justice and for the convenience of the parties.” 28 U.S.C. § 1477.
On motion of the respective trustees, the Bankruptcy Court ruled that venue for Montano’s and Barnes’ plans was improper in the District of Columbia. See In re Abel Montano, Bankr. No. 80-00071 (Bankr.D.D.C. April 8, 1980) (unpublished memorandum opinion); In re Wavalene Barnes, Bankr. No. 79-00293 (Bankr.D.D.C. April 25, 1980) (unpublished order). The court *20 rejected Montano’s arguments that (1) future wages from his job with a District of Columbia employer constituted his “principal asset[ ],” thus meeting one of the venue criteria under 28 U.S.C. § 1472, and (2) such employment similarly constituted a “principal place of business” under the statute. The Bankruptcy Court said:
[T]he mere fact that [Montano’s] earnings emanate from a source in the District of Columbia and were previously deposited in a District of Columbia depository do [sic] not provide a legal basis for arguing that the “principle assets” [sic] are located in this jurisdiction.
* * * * * *
As to the debtor’s second argument . . . the Court cannot equate the term “principal place of business” with “principal place of employment”. Firstly, the terms are clearly not intended to be used interchangeably . . . and over a period of time the term “principal place of business” has acquired a relatively fixed meaning.
* * * * * *
. . . Accordingly, the court, based on the facts presented, sees no reason for disturbing the well-established meaning of “principal place of business.”
In re Abel Montano at 2-3 (citations omitted). The Bankruptcy Court refused to retain the case pursuant to 28 U.S.C. § 1477, saying:
In view of the fact -that this case was filed in -the wrong venue, the burden of proof should be borne by the debtor, to establish those facts which would provide a proper basis for retention .... [T]he court is of the opinion that there are no compelling reasons which would justify retention of this case. On the contrary, the debtor is a resident of Alexandria, Virginia and is, therefore, equally accessible to the United States Bankruptcy Court in Alexandria, Virginia. The creditors scheduled in this case are located throughout the Washington metropolitan area and no purpose, either beneficial or otherwise, would be served by retention. In reality, the reasons advanced by the debtor (Principally dealing with the amount due to the debtor’s Credit Union, proximity to his place of employment here in the District of Columbia, and on the necessity of retaining Virginia counsel in the event of transfer) are specious ones when considered against the well-established criteria of prior case law.
Id. at 3-4. The Bankruptcy Court ordered that the cases be transferred to the debtors’ domiciles (the Eastern District of Virginia for Montano and the District of Maryland for Barnes), but stayed implementation of the transfers pending appeal of the venue ruling. On appeal the District Court did not decide the venue question, concluding that “because the bankruptcy judge proceeded to the merits . . . the venue determination is moot.” In re Barnes, 13 B.R. 997, 998 (D.D.C.1981).
The venue issue is not moot. The Bankruptcy Court did not vacate its transfer order by proceeding to the merits, but merely stayed it pending appeal, as permitted by Rule 805 of the Rules of Bankruptcy Procedure.[15] The issue of venue is of continuing interest to both debtors, since additional proceedings will be necessary to rule on modifications to their plans and for continued supervision if the plans are confirmed. Which bankruptcy court will conduct these proceedings is clearly a live controversy.
We turn first to Montano’s argument that his job at the World Bank constitutes a “principal place of business” in the District of Columbia within the meaning of section 1472. Under prior law, venue was undoubtedly proper in the district where the Chapter XIII wage earner worked: Rule 13—110 of the Rules of Bankruptcy Procedure specifically provided that a Chapter XIII petition could be filed “where the petitioner has his principal place of employment, resi *21 dence, or domicile.”[16] The difficulty is that section 1472 supersedes Rule 13-110,[17] and provides for venue at the debtor’s domicile, residence, principal place of business or where his principal assets are located, but fails to mention “principal place of employment.” The omission may have been a purposeful limitation on the debtor’s choice of bankruptcy courts, or may have been an oversight. The legislative history provides no clue. See H.R.Rep.No. 595, 95th Cong., 1st Sess. 446 (1977); S.Rep.No. 989, 95th Cong., 2d Sess. 155 (1978). In the absence of evidence to the contrary, however, we must assume Congress was aware of Rule 13-110, and realized that section 1472 deleted “principal place of employment” as a location for proper venue.
Montano urges that we nonetheless interpret “principal place of business” under section 1472 to include the debtor’s place of employment. We cannot do so. Under prior law, courts generally held that a salaried employee did not have a “place of business” where he was employed.[18] See, e.g., In re Lipphart, 201 F. 103 (S.D.N.Y.1912); see generally 1 Collier on Bankruptcy § 3.02 at 3-132 n.23 (15th ed. 1982). In Higgins v. State Loan Co., 72 App.D.C. 328, 114 F.2d 25 (1940) this court stated:
It would seem reasonable to conclude . . . that whatever meaning the phrase “place of business” may have generally, as used in the Bankruptcy Act for jurisdictional purposes it means a place where the bankrupt has a business of his own.
Id. at 330, 114 F.2d at 27. Montano may be correct that the Higgins rule was based, at least in part, on the assumption that employees do not contract many debts in the district where they are employed (Appellee’s Br. at 38); see Higgins, 72 App.D.C. at 330, 114 F.2d at 27. With the advent of credit cards and other commercial practices, *22 this assumption may no longer be valid. However, where Congress uses a term like “principal place of business” with a relatively fixed historical meaning, we cannot now introduce a new interpretation.
We must similarly reject Montano’s argument that his future earnings qualify as “principal assets” under section 1472. The one bankruptcy court- to consider the issue states that “[w]ages, in the absence of a contract of employment, are not assets until they are earned,” concluding “the expectation of future wages is not a consideration in determining where [a] debtor’s principal assets are located.” In re Vann, 3 B.R. 192, 194 (Bkrtcy.E.D.Pa.1980). Montano argues that in a Chapter 13 case future earnings are considered “property of the estate” under 11 U.S.C. § 1306(a) and constitute the main “asset” of interest to creditors. He attempts to distinguish the Vann case on the grounds that his government employment provides “civil service-type job tenure” and is more than an expectation of future wages. (Appellee’s Br. at 41 n.36). Montano may be correct in his observations, but neither point makes his interest in future wages “principal assets” for the purpose of venue. First, the term “principal assets” has a long history under prior law.[19] It appeared primarily in the context of corporate reorganizations, and generally referred to property owned by the corporation at the time of filing. See, e.g., Watters v. Hamilton Gas Co., 10 F.Supp. 323, 326 (S.D.W.Va.), aff’d, 79 F.2d 428 (4th Cir.), cert. denied, 296 U.S. 647, 56 S.Ct. 307, 80 L.Ed. 460 (1935).[20] We cannot say Congress intended to change the meaning of “principal assets” when it included that phrase in section 1472 and made it applicable to Chapter 13. Second, the construction urged by Montano would in many cases authorize venue at the debtor’s place of employment, since this is the most plausible situs for the “principal asset” of future wages. As mentioned above, Congress failed to include in section 1472 the “principal place of employment” language previously contained in Rule 13-110. We think it inappropriate to restore to the statute “principal place of employment” in another guise. Cf. In re Marine Aircraft Corp., 118 F.Supp. 844, 846 (S.D.N.Y.1954).
Finally, Montano argues that even if venue is improper in the District of Columbia, the Bankruptcy Court should have retained the case “in the interests of justice and for the convenience of the parties” pursuant to 28 U.S.C. § 1477(a).[21] Montano raises two arguments in support of this proposition: (1) that the Bankruptcy Court erred in requiring Montano to show “compelling reasons” for retention, and (2) even if the burden was properly on Montano the Bankruptcy Court abused its discretion in transferring the case.
It is established under bankruptcy law that once venue is shown to be improper, the burden shifts to the party seeking retention of the improperly-filed case. See In re Miller, 15 B.R. 977, 979 *23 (E.D.Pa.1981); In re Valley Fair Corp., 16 C.B.C. 586, 589-91 (Bkrtcy.S.D.N.Y.1978). Although courts differ on the precise standard of proof the debtor seeking retention must meet,[22] the discretion to retain an improperly-filed case “must be used with caution and in few cases.” In re Commonwealth Oil Refining Co., 596 F.2d 1239, 1241 (5th Cir. 1979), cert. denied, 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980); In re S.O.S. Sheet Metal Co., 297 F.2d 32 (2d Cir. 1961); In re L.F. Popell Co., 221 F.Supp. 534 (S.D.N.Y.), aff’d per curiam, 323 F.2d 50 (2d Cir. 1963). Inasmuch as it is the debtor’s obligation to commence the proceeding in a permissible forum, we think it appropriate to require the debtor to show strong reasons for retaining an improperly-filed case. Consequently, we cannot say the Bankruptcy Court erred in requiring the debtors to show “compelling reasons” for retention.
However, no matter what standard of proof applies, the overriding consideration in a transfer decision must be, as the statute says, “the interests of justice and the convenience of the parties.” Montano states that transfer will require him to miss substantial amounts of time from work to attend hearings; will cause him to incur added expense in retaining Virginia counsel; will cause delay because the backlog of cases is far greater in Virginia than in the District; and provides no significant benefit to the creditors, who are located throughout the metropolitan area. (Appellee’s Br. at 44-46.) These are certainly strong reasons to retain the case. Neither the Bankruptcy Court nor the trustee presents any reason why venue in the districts of the debtors’ domiciles satisfies the interests of justice or the convenience of any party. Instead, they rely on the fact that venue would have originally been proper at the debtors’ domiciles. This is not the analysis called for by section 1477(a), which permits the bankruptcy court to retain the case or to transfer to any other district, even another “wrong” district. See 1 Collier on Bankruptcy ¶ 3.02[6][d] at 3-216; cf. 28 U.S.C. § 1404(a). Clearly, section 1477(a) contemplates finding the most appropriate forum under the circumstances, and we think the Bankruptcy Court did not approach the retention decision in this fashion.
Our review is limited to ascertaining whether the Bankruptcy Court abused its discretion in ordering transfer. In re Tonkawa Refining Co., 502 F.2d 1341, 1343 (10th Cir. 1974). Montano has presented strong reasons for retaining his case. Because neither the Bankruptcy Court nor the trustee has presented any reason why transfer would serve the interests of justice and the convenience of the parties, we must conclude that transfer was an abuse of discretion.
Basing his action on his memorandum opinion in the Montano case, the Bankruptcy Judge transferred the Barnes case to Maryland, the district of her domicile. What we have said about the Montano transfer applies to the Barnes transfer as well.
Accordingly, we vacate the transfer orders entered in both cases, and direct that the cases be retained in the District of Columbia for proceedings not inconsistent with this opinion.

So ordered.

. In Northern Pipeline Construction Co. v. Marathon Pipe Line Co., - U.S. -, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Supreme Court held unconstitutional the assignment in 28 U.S.C. § 1471 (Supp. IV 1980) of broad jurisdiction to non-Article III bankruptcy judges. The ruling casts into doubt the entire statutory scheme of the 1978 Bankruptcy Reform Act. However, the Court stated:
It is ... plain that retroactive application would not further the operation of our holding, and would surely visit substantial injustice and hardship upon those litigants who relied upon the Act’s vesting of jurisdiction in the bankruptcy courts. We hold, therefore, that our decision today shall apply only prospectively.
Id. - U.S. at -, 102 S.Ct. at 2880. (footnote omitted) We interpret this to mean the Northern Pipeline decision does not affect bankruptcy court decisions pending on appeal before June 28, 1982, the date of the Supreme Court opinion. The Court’s rationale of avoiding injustice and hardship applies with special force here, where the litigants have already borne the expense of two appeals (one to the District Court and one to this court) in addition to the bankruptcy proceeding.

. The new Bankruptcy Code was created by the Bankruptcy Reform Act of 1978, Pub.L.No. 95-598, 92 Stat. 2549 (1978). The Code repealed the Bankruptcy Act of 1898, ch. 541, 30 Stat. 544 (1898), as amended by the Chandler Act, ch. 575, 52 Stat. 840 (1938).

. Chandler Act, 52 Stat. 930, previously codified at 11 U.S.C. §§ 1001-86 (1976) (repealed 1978). Throughout, we refer to the wage earner’s provisions under the amended 1898 Act as “Chapter XIII” and to those provisions under the Bankruptcy Code as “Chapter 13.”

. For a comprehensive discussion of the debate, see Cyr, The Chapter 13 “Good Faith” Tempest: An Analysis and Proposal for Change, 55 Am.Bankr.L.J. 271 (1981).

. Courts have developed a variety of tests under section 1325(a)(3), requiring inter alia that the debtor make “substantial payments,” that the payments represent the debtor’s “best ef *15 fort,” and others. See generally 5 Collier on Bankruptcy ¶ 1325.01 at 1325-8 n.51 (15th ed.) (Supp. Nov. 1981). For convenience we refer to these tests collectively as requiring “meaningful repayment.”

. Chapter 13 plans offering no payments to unsecured creditors raise additional questions not present here, e.g., whether such a debtor meets the definition of an “individual with regular income” in 11 U.S.C. § 101(24). We do not address the legality of zero-payment plans today. See In re Goeb, 675 F.2d 1386, 1388-89 n.5 (9th Cir. 1982).

. Section 651 of the Bankruptcy Act, for example, the predecessor to section 1325(a) under Chapter XIII, required that the court be “satisfied that the pian and its acceptance are in good faith and have not been made or procured by any means, promises or acts forbidden by this title.” 52 Stat. 934, previously codified at 11 U.S.C. § 1051 (1976) (repealed 1978). See also Rules Bankr. Proc. Rule 13-213(a); Bankruptcy Act, § 361, 52 Stat. 911, previously codified at 11 U.S.C. § 761 (1976) (repealed 1978); Bankruptcy Act, § 472, 52 Stat. 923, previously codified at 11 U.S.C. § 872 (1976) (repealed 1978).

. One pre-1978 decision states that the good faith inquiry should concern whether there has been “an abuse of the provisions, purpose, or spirit of the chapter in the proposal or acceptance of the arrangement.” In re Village Men’s Shops, Inc., 186 F.Supp. 125, 129 (S.D.Ind. 1960). Although this definition is broad enough, perhaps, to encompass a meaningful repayment standard, the definition is taken *16 from 8 Collier on Bankruptcy ¶ 9.20 (14th ed. 1960) where it is offered as a gloss on decisions such as American United Mutual Life Ins. Co. v. Avon Park, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 (1940), which concerned allegations of fraudulent misconduct. In any case, we agree with one court’s assessment that “[t]oo much weight should not be given to Collier’s observation.” In re Goeb, 675 F.2d 1386, 1390 n.9 (9th Cir. 1982).

. The House Report, for example, often mentions "repayment” of debts under Chapter 13 plans. See, e.g., H.R.Rep.No. 595, 95th Cong., 1st Sess. 117-18 (1977). A possible inference is that Congress did not intend confirmation of low-percentage plans which offer essentially no “repayment.” Another sentence in the House Report notes creditors’ losses under Chapter 13 “will be significantly less than if their debtors opt for straight bankruptcy.” House Report, supra, at 118, U.S.Code Cong. & Admin.News 1978, p. 6079. The implication here is that one percent plans should not be confirmed because they do not “significantly” reduce creditors’ losses. Finally, part of the Senate Report states, “[i]t is also necessary to prevent chapter 13 plans from turning into mere offers of composition plans under which payments would equal only the non-exempt assets of the debtor.” S.Rep.No. 989, 95th Cong., 2d Sess. 13 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5799. A strong argument can be made that low-percentage Chapter 13 plans are extremely close to such “mere offers of composition.”

. The same House Report cited above as supporting “repayment” notes in the same paragraph, “[i]n some cases, the plan will call for full payment. In others, it may offer creditors a percentage of their claims in full settlement.” H.R.Rep.No. 595, 95th Cong., 1st Sess. 118 (1977), U.S.Code Cong. & Admin.News 1978 p. 6079. Further statements emphasize that Chapter 13 plans are to be based on the debtor’s “exact circumstances,” S.Rep.No. 989, 95th Cong., 2d Sess. 13 (1978), U.S.Code Cong. & Admin.News 1978, 5779, and stress the need to provide effective relief for “consumers who have overburdened themselves with debts,” House Report, supra, at 116 (1977), U.S.Code Cong. & Admin.News 1978, 6076. Another portion notes the only restriction on plan content is that creditors receive more than they would get in a liquidation under Chapter 7, implying that no other provision entitles creditors to more. Id. at 123-24.

. Section 127(b) of the Technical Amendments Bill would have amended 11 U.S.C. § 1325(a)(4) to read as follows:
(a) The court shall confirm a plan if—
sk sk * sk *
(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured *17 claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date, and such plan represents the debtor’s bona fide effort. ...
126 Cong.Rec.H. 11,735 (daily ed. Dec. 3, 1980) (italicized portion added by proposed amendment). For a discussion of how such a test would operate, see Note, Filing for Personal Bankruptcy: Adoption of a “Bona Fide Effort” Test under Chapter 13, 14 U.Mich.J.L.Ref. 321 (1981).

. See 126 Cong.Rec.S. 15,176 (daily ed. Dec. 1, 1980).

. Cf. In re Goeb, 675 F.2d 1386, 1389 n.6 (9th Cir. 1982).

. Venue under the Bankruptcy Act was governed in large part by the Rules of Bankruptcy Procedure, which prescribed venue standards according to the type of proceeding. See Rules Bankr.Proc. Rule 116 (straight bankruptcy); Rule 10-114 (Chapter X); Rule 13-110 (Chapter XIII). See generally Kennedy, The Bankruptcy Court under the New Bankruptcy Law: Its Structure, Jurisdiction, Venue and Procedure, 11 St. Mary's L.J. 251, 295-309 (1979).

. Rule 805 states in pertinent part that the bankruptcy judge “may suspend or order the continuation of proceedings or make any other appropriate order during the pendency of an appeal upon such terms as will protect the rights of all parties in interest.” Rules Bankr. Proc. Rule 805.

.Rule 13-110 provided in relevant part:
(a) Proper Venue.
(1) Single Petitions. A single petition may be filed pursuant to Rule 13-103 in the district where the petitioner has his principal place of employment, residence, or domicile. A single petition filed pursuant to Rule 13-104 shall be filed with the court in which the bankruptcy case is pending.
(2) Joint Petitions. A joint petition authorized by Rule 13-111(a) and filed pursuant to Rule 13-103 may be filed in a district of proper venue for either petitioner under paragraph (1) of this subdivision. A joint petition authorized by Rule 13-111(a) and filed pursuant to Rule 13-104 may be filed in a court in which either petitioner is a bankrupt in a pending bankruptcy case.
(b) Transfer of Cases; Dismissal or Retention When Venue Improper.
(1) When Venue Proper. Although a petition is filed in accordance with subdivision (a) of this rule, the court may, after hearing' on notice to the petitioner or petitioners and such other persons as it may direct, in the interest of justice and for the convenience of the parties, transfer the case to any other district. The transfer may be ordered at or before the first meeting of creditors either on the court’s own initiative or on motion of a party in interest but thereafter only on a timely motion.
(2) When Venue Improper. If a petition is filed in a wrong district, the court may, after hearing on notice to the petitioner or petitioners and such other persons as it may direct, dismiss the case or, in the interest of justice and for the convenience of the parties, retain the case or transfer it to any other district. Such an order may be made at or before the first meeting of creditors either on the court’s own initiative or on motion of a party in interest but thereafter only on a timely motion. Notwithstanding the foregoing, the court may without a hearing retain a case filed in a wrong district if no objection is raised.
Rules Bankr.Proc. Rule 13—110(a), (b).

. During the “transition period” from October 1, 1979 to March 31, 1984 the Rules of Bankruptcy Procedure continue to apply “to the extent not inconsistent with the amendments made by” the Bankruptcy Reform Act. Pub.L.No. 95-598, § 405(d), 92 Stat. 2685 (1978). When the statute prescribes a single uniform provision governing venue, as in 28 U.S.C. § 1472, the Rules of Bankruptcy Procedure providing additional grounds for venue are clearly inconsistent with the statute and are superseded. See Kennedy, supra note 14, at 298 n.192.

. Although one pre-1978 decision permitted the debtor to file at his place of employment under Bankruptcy Act section 2(a), see Milwaukee Corrugating Co. v. Flagge, 19 F.2d 518 (8th Cir. 1927), that decision did not discuss the issue and has already been criticized by this court as unpersuasive. See Higgins v. State Loan Co., 72 App.D.C. 328, 330, 114 F.2d 25, 27 (1940).

. See Bankruptcy Act, § 77B, 48 Stat. 912, previously codified at 11 U.S.C. § 207 (1937) (repealed 1938); Bankruptcy Act, § 128, 52 Stat. 886, previously codified at 11 U.S.C. § 528 (1976) (repealed 1978); Rules Bankr.Proc. Rule 116(a)(2), Rule 10-114(a)(1). See generally Note, Venue under the Chandler Bill in Corporate Bankruptcy and Reorganization Proceedings, 5 U.Chi.L.Rev. 272 (1938).

. In the Watters case, the court stated
[I]t is plain that the “assets” . .. spoken of in [section 77B of the Bankruptcy Act, which mentioned “principal assets”] must be the “assets” .. . owned by the debtor at the time the petition is filed, from which is to be derived the earnings with which to pay the creditors and other security holders interested in the debtor’s business.
Watters v. Hamilton Gas Co., 10 F.Supp. 323, 326 (S.D.W.Va.), aff'd, 79 F.2d 428 (4th Cir.), cert. denied, 296 U.S. 647, 56 S.Ct. 307, 80 L.Ed. 460 (1935).

.Section 1477 provides:
(a) The bankruptcy court of a district in which is filed a case or proceeding laying venue in the wrong division or district may, in the interest of justice and for the convenience of the parties, retain such case or proceeding, or may transfer, under section 1475 of this title, such case or proceeding to any other district or division.
(b) Nothing in this chapter shall impair the jurisdiction of a bankruptcy court of any matter involving a party who does not interpose timely and sufficient objection to the venue.

. See In re Louis Marx & Co., 2 C.B.C.2d 49, 52 (Bkrtcy.S.D.N.Y.1980) (“fair preponderance of the evidence”); In re Vann, 3 B.R. 192, 194 (Bkrtcy.E.D.Pa.1980) (court treated retention as a matter of discretion).