FINANCE ONE OF NEW JERSEY,
Appellant,

v.

Thomas RAIKES, Petitioner-Appellee.

Civ. A. No. 82–3089.

United States District Court,
D. New Jersey.

Feb. 24, 1983.

Howard P. Schiff, Daniel C. Schiff, West Long Branch, N.J., for appellant.

David Paul Daniels, Camden, N.J., for petitioner-appellee.

## OPINION

GERRY, District Judge.

The petitioner-appellee, Thomas Raikes, proposed a plan pursuant to Chapter 13 of the Bankruptcy Act of 1978, 11 U.S.C. § 1301–1330, under which he would make no payments to unsecured creditors. The bankruptcy judge, after limited discovery and a short hearing on debtor's exempt budget, confirmed the plan over the objections of one unsecured creditor, appellant Finance One of New Jersey.

The appellant contends that the bankruptcy court as a matter of substantive bankruptcy law erred in finding that a plan allowing no payments to unsecured creditors evinced the good faith required by 11 U.S.C. § 1325(a)(3), and in not holding that other provisions of § 1325(a)(3) require meaningful payment to unsecured creditors.

The appellant also urges that the bankruptcy judge committed "evidentiary" errors: (1) in allowing an amendment of the petition on the basis of new evidence introduced at the confirmation hearing without the prior filing of a formal amendment; (2) in allowing debtor to introduce evidence at the confirmation hearing which was requested in, but not supplied in response to, the objecting creditor's pre-hearing interrogatories; and (3) in holding irrelevant to the determination of "good faith" prior Chapter 13 Plans and Budgets proposed by debtor.

Finally, appellant urges that gross discrepancies between the debtor's original and amended Chapter 13 Plan and Budget, as well as other facts established by the record, compel a conclusion of bad faith, and that the Bankruptcy Court erroneously ignored those discrepancies and facts adverse to the debtor.

### I.

Thomas Raikes filed a Chapter 13 plan on February 10, 1980. The original plan listed two secured creditors and one unsecured creditor. The two secured creditors hold mortgages on Raikes' residence. Bankers Mortgage Corporation holds a first mortgage of $37,000 on the house; the plan estimated that Raikes was $5,000 in arrears on the note. First People's Bank holds a second mortgage on the house, with no arrears.

Finance One of New Jersey, Inc., appellant here and an unsecured creditor, had due from Raikes $1,135.52 on a personal loan.

Under the original plan, and its accompanying budget, Raikes claimed a monthly net income of $1,223.00 (approximately $282.25 per week). Of that income, Raikes claimed $1,127.15 as expenses that would fall outside the plan:

| | |
|---|---|
| First Mortgage Payment | $328.00 |
| Utilities | 170.00 |
| Food | 200.00 |
| Clothing | 50.00 |
| Laundry | 30.00 |
| Newspaper/Books | 20.00 |

| | |
|---|---|
| Medical/Drug Expense | 10.00 |
| Car Insurance | 50.00 |
| Transportation | 100.00 |
| Recreation | 30.00 |
| Second Mortgage | 139.15 |
| Total | $1,127.15 |

This budget left an excess of $95.85; the plan proposed to pay $86.21 per month to the one secured credit with an arrearage, the first mortgage holder. The unsecured creditor, appellant, would receive nothing.

On March 25, 1982, the debtor filed an amendment to the plan. The amendment "crammed down" the second mortgage holder, effectively rendering First People's Bank an unsecured creditor. *See* 11 U.S.C. § 506(a) and 1325(a)(5).[1] The amendment contained a revised budgetary schedule:

| | Original | Revised |
|---|---|---|
| First Mortgage Payment | $328.00 | $328.00 |
| Utilities | 170.00 | 170.00 |
| Food | 200.00 | 300.00 |
| Clothing | 50.00 | 50.00 |
| Laundry | 30.00 | 30.00 |
| Newspaper/Books | 20.00 | 23.00 |
| Medical/Drug Expense | 10.00 | 20.00 |
| Car Insurance | 50.00 | 50.00 |
| Transportation | 100.00 | 125.00 |
| Recreation | 30.00 | 30.00 |

Thus, the revised plan increased budgetary allotments for food, newspapers/books, medical and drug expenses, and transportation. The increase in those categories roughly equaled the amount of money that would have been allocated to the second mortgage holder under the original plan, thus leaving about the same excess (amount of net income minus the budget) as under the original plan. Under the revised plan, the debtor proposed a payment of $88.03 to the trustee to satisfy the arrearage on the first mortgage.

The essence of appellant's objections is this: that a Chapter 13 Bankruptcy Plan cannot satisfy Chapter 13, U.S.C. § 1325(a)(3)'s requirement of "good faith" when that plan proposes no payment to unsecured creditors.

1. "Crammed down" is a shorthand expression/term of act which permits a secured party to receive only the value of its security plus an interest factor. See § 1325(a)(5). The cram down in this case reduced the second mortgage holder to an unsecured creditor, because the

Alternatively, according to appellant, the facts established below indicate that Raikes' plan was not proposed in "good faith," because debtor assertedly has more than ample resources to make full restitution to all secured and unsecured creditors.

## II.

Chapter 13 of the Bankruptcy Code, 11 U.S.C. § 1301 *et seq.* (Supp. IV 1980), permits certain debtors to repay all or a percentage of their debts out of future income according to a court-approved plan. Unlike liquidation or "straight" bankruptcy under Chapter 7, 11 U.S.C. § 701 *et seq.*, Chapter 13 does not require the debtor to surrender all non-exempt assets for distribution to creditors. Instead, the debtor makes continuing payments to creditors over a three to five year period. 11 U.S.C. § 1322(c). Upon completion of the plan, the Chapter 13 debtor is entitled to a broad discharge of his obligations. 11 U.S.C. § 1328(a).

Before the plan can become effective, however, it must be confirmed by the Bankruptcy Court. Section 1325(a) sets out six criteria for confirmation as follows:

(a) The court shall confirm a plan if—

(1) the plan complies with the provisions of this chapter and with other applicable provisions of this title;

(2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;

(3) the plan has been proposed in good faith and not by any means forbidden by law;

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;

second mortgage arose out of re-financing past debts, and the property was not valued in excess of the first mortgage—hence, the "value" of its (second mortgage holder's) security was zero.

(5) with respect to each allowed secured claim provided for by the plan—

    (A) the holder of such claim has accepted the plan;

    (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

    (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

    (C) the debtor surrenders the property securing such claim to such holder; and

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

11 U.S.C. § 1325(a). If all six requirements are satisfied, the bankruptcy court must confirm the plan. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 430 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

■ Appellant urges that a Chapter 13 Plan providing *no* payments to unsecured creditors cannot satisfy the good faith requirement of § 1325(a)(3). The bankruptcy judge rejected appellant's argument, and so does this court on review.

Congress has never statutorily defined the "good faith" requirement found in § 1325(a)(3). Courts and commentators disagree as to whether the "good faith" criterion for confirmation requires any minimum level of payment to any or all creditors. Several bankruptcy courts have discerned in the good faith requirement a rule that the debtor must make "meaningful payments." *See, e.g., In re Iacovoni,* 2 B.R. 256 (Bkrtcy.D.Utah 1980). Other courts eschew such attempts to impose upon the words "good faith" any particular payment standard, and instead give "good faith" its historically accepted meaning of honesty and fair dealing. *See In re Cloutier,* 3 B.R. 584 (Bkrtcy.D.Colo.1980).

Courts that have evaluated Chapter 13 plans proposing a nominal payment to unsecured creditors have approved confirmation, finding that "good faith" does not *per se* require any particular level of minimum payment. *See, e.g., Barnes v. Whelan,* 689

F.2d 193, 198 (D.C.Cir.1982); *In re Goeb,* 675 F.2d 1386 (9th Cir.1982).

Under a prudent reading of this view of good faith, the good faith required by § 1325(a)(3) depends on an evaluation of any number of factors, indeed upon the totality of the circumstances of and surrounding the petition; the good faith determination turns upon whether the debtor acted equitably in proposing the Chapter 13 Plan. *In re Goeb,* 675 F.2d 1386; *In re Rimgale,* 669 F.2d 426, 432 (7th Cir.1982).

This court likewise holds that the "good faith" language of 11 U.S.C. § 1325(a)(3) does not require that unsecured creditors receive any minimum level of payment. Two considerations compel this conclusion with particular cogency. First, § 1325 sets out six standards that a Chapter 13 Plan must satisfy—one of those standards being that the plan is "proposed in good faith." 11 U.S.C. § 1325(a)(3). Another provision, § 1325(a)(4), explicitly requires that a Chapter 13 Plan offer to unsecured creditors no less than they would receive under a Chapter 7 liquidation. The presence of an explicit standard in § 1325(a)(4) governing amounts payable to unsecured creditors under a Chapter 13 Plan discredits the notion that Congress intended the general "good faith" language in § 1325(a)(3) to impose another, more rigorous standard of a minimum amount payable to unsecured creditors. *See Barnes v. Whelan,* 689 F.2d 193 at 198, (approving a nominal 1% payment to non-secured creditors).

The court notes that the record reflects that the bankruptcy judge found that Raikes' plan satisfied § 1325(a)(4).

Second, the Supreme Court, in interpreting a similarly undefined "good faith" provision of another bankruptcy provision, seemed to find definitive the "equity and good conscience" of the petitioner. *See American United Mutual Insurance Co. v. City of Avon Park,* 311 U.S. 138, 144–45, 61 S.Ct. 157, 161, 85 L.Ed. 91 (1940).

■ Similarly, whether a Chapter 13 Plan has been proposed in good faith should turn upon whether the debtor has acted equitably in proposing the plan.

*Barnes v. Whelan* and *In re Goeb* both involved Chapter 13 plans proposing nominal, one percent payment plans. But those cases' reasoning applies persuasively here, in the case of a zero payment to unsecured creditors.

Thus, this court agrees with the court below that zero payments to unsecured creditors do not automatically stigmatize a Chapter 13 Plan as one proposed in bad faith. Good faith must mean equitable intention and action; good faith or absence of good faith must depend upon an analysis of the facts of each case.

In the alternative, appellant has urged that under the view of "good faith" the court herein adopts, Raikes' Chapter 13 Plan cannot pass muster. Related to appellant's argument are its several evidentiary objections to the bankruptcy court proceedings below.

### III.

First, appellant contends that the debtor's own statement of monthly expenses was unsupported and contrived, with the sole purpose to demonstrate that no "excess funds" would be available for payment of unsecured creditors. The amended plan "crammed down" the second mortgage on debtor's residence, relegated the holder to unsecured status, and thereby freed up about $138.00 per month not available in the original plan. But that same amended plan also increased budget allowances for food ($200 to $300), transportation ($100 to $125), medical and drug expenses ($10 to $20), and newspapers/books ($20 to $23); those increases absorbed the money that would have paid the second mortgage under the original plan.

Appellant contends that the budgetary increases were not made in good faith, but rather to deprive creditors of funds that should have been "excess." Appellant further urges that the bankruptcy judge improperly refused to consider as relevant to good faith the initial budgetary estimates, and further impermissibly did not consider the discrepancies between the original and the amended budget as relevant upon the issue of good faith.

As an interrelated, and perhaps overriding, objection, appellant asserts that the bankruptcy court found that debtor's monthly income was $1340.00, not $1223.00, as set out in the plan, and that this finding is wholly inconsistent with the court's approval of the plan's payment of only $88.03 monthly—given that the debtor's budget as allowed by the court was $1126.00.

Contrary to appellant's urgings, the court below did *not* clearly find that debtor's income was $1340.00 per month. The court's description of the debtor's income is not so definite.

First Finance took issue with the stated amount of income and the budgetary items of the Debtor and I, therefore, adjourned the matter to enable First Finance to submit interrogatories to the Debtor as to such income and disbursements. On the Adjourned trial date of August 4, 1982, it was revealed that the attorney for Finance One had been furnished information relating to the Debtor's weekly income through pay stubs and he had opportunity to question the Debtor's expenditures.

The pay stubs of the Debtor revealed that his income would be approximately $1,340.00 a month or an excess of $117.00 over expenditures instead of $97.00 excess, or $20.00 more per month. However, his pay stubs ranged between $199.11 and $242.00 per week for the period June to August, 1982. Finance One could not establish any "fat" in the Debtor's budget.

22 B.R. 837.

The court's remarks say only that the pay stubs produced in response to interrogatories "would" establish his income at $1,340.00 per month. But the court seemed to qualify or undermine that comment by observing that for a relevant three-month period in 1982 the pay stubs showed variations in income between $199.11 per week (approximately $862/month) and $242.00 per week (approximately $1,048.00/month). Apparently, on the basis of these inconsist-

encies, the court seemed to have concluded that the plan's figure of $1,223.00/month was fair.

The transcript of the confirmation hearing tends to support our reading of the written opinion. *See* Transcript as set out in Appendix to Appellant's Brief at 29A to 33A.

THE COURT: He shows $1,126 as his budget.

MR. SCHIFF: And I show a net income of $1,340 allowing for $214.00 excess.

THE COURT: Excess for his income to be $1,223, you say it is how much?

MR. SCHIFF: $1,340, according to the last three paystubs submitted in interrogatories. Any subsequent evidence not being supplied to my office, I object to its admissibility.

THE COURT: I thought the net four weeks was $1,236, I multiplied that by 13—

MR. SCHIFF: $1,680, and divide by 12 to get a full month, and you get $1,340.

THE COURT: Instead of $1,223.

MR. SCHIFF: Exactly, and I say the $117.00 could be applied directly.

THE COURT: What about that, Mr. Daniels?

MR. DANIELS: Your Honor, the Debtor is here, I think we must deal with the realities of the situation, the Debtor's pay today is around $230.00–$240.00—

THE COURT: What is the last week?

MR. DANIELS: The last one is 8–3, Your Honor, he took home $232.00.

MR. SCHIFF: I object to the admissibility, he hasn't supplied them to me.

THE COURT: I don't care whether you object or not, I want to get to the truth.

MR. SCHIFF: Okay, for the record I object.

THE COURT: And for the record, overruled. All I want to do is find out what the man makes, and what it cost to live, and then I pass upon it.

MR. SCHIFF: May I see them? How many do you have?

MR. DANIELS: There is a half a dozen of them.

THE COURT: What is the one before that? I have 8–3 now, what is the one before that?

MR. SCHIFF: For the record, they are selective, the last one he has before that is 7–13. The net pay is $242.00.

THE COURT: What about another one before that?

MR. SCHIFF: 6–29, we see a net of $199.11, but we don't have the hours, by the way, oh, 33 regular hours, 31, so he is not working here—

THE COURT: Give me another one before that.

MR. SCHIFF: 6–15, we get $229, 6–8, we get $236.00, 6–1, $237.00.

Your Honor, I would like to point out that the yearly returns, we have his yearly income tax which also disagrees—

THE COURT: I can take his testimony and spend an hour listening to his testimony week by week, I want to get right down to approximately what his income is, and it would appear as though the net would run, approximately, looking at the figures, approximately $230.00, I would say that would be a realistic figure.

What we have to look as to what his income is, and it runs $1,000 a month, according to this, and we have it plugged in for $1,126, so therefore, or rather $1,223, so it looks like the Debtor is giving everybody an honest count.

Whatever may be said of some of the evidentiary rulings contained in the colloquy at the hearing at pp. 29A to 33A, that colloquy casts doubt on appellant's contention that the court below found the debtor's income to be $1,340.00 per month.

Since our resolution of this appeal will entail a remand, *see infra* pp. 976 to 977, the court will direct the bankruptcy judge to clarify his finding as to the debtor's monthly income. The determination of the

debtor's available monthly income significantly affects any assessment of "good faith" in the instant case. It may be, for example, that assuming an income of $1,223.00, the debtor's amended plan would meet the test of good faith; whereas an income $117.00 higher might place his proposed Chapter 13 Plan in a wholly different light.

## IV.

■ Appellant raises certain evidentiary matters that did, or perhaps will, affect the determination of the debtor's available monthly income, the debtor's budget, and ultimately the question of good faith.

First, appellant protests that the court improperly considered certain pay stubs produced by the debtor's attorney at the final confirmation hearing but allegedly not produced by the debtor in response to the creditor's prior interrogatories. The interrogatory had asked for pay stubs from the four pay periods prior to the answering of the interrogatory.

Interrogatories were served upon the debtor by the objecting creditor and appellant herein on May 6, 1982, in accordance with Judge Lipkin's order of April 29, 1982. In his answers to those interrogatories, the debtor provided his pay stubs for the period April 27 to May 18, 1982 inclusive. At the confirmation hearing of August 4, 1982, the debtor's attorney produced selective pay stubs for the following dates: June 1, 8, 15, 29, July 13 and August 3, 1982. The debtor did not produce pay stubs for May 25, June 22, or July 6, 20 or 27, 1982. At the confirmation hearing, the appellant herein objected to admissibility of those pay stubs not produced in answers to interrogatories, and the objection was overruled. (Transcript, Page 11 and 12.)

According to Finance One, the production of selective pay stubs at the hearing, without prior notice to the appellant, placed the appellant at a severe disadvantage and jeopardized its right to a fair hearing for the following reasons: (1) the debtor produced only six of the eleven pay stubs for the period in dispute, and, therefore, without prior notice, the creditor was unable to determine whether the pay stubs not produced showed a higher or lower income than those which were produced; (2) pay stubs that were produced were not authenticated, as required by Rule 901 of the Federal Rules of Evidence; (3) the debtor failed to promptly supplement his answers to interrogatories, as required by Rule 26(e)(2)(B) and 37(b) of the Federal Civil Rules.

As a technical matter, it is not entirely clear that debtor did not respond adequately to interrogatories; though he didn't supplement his answers, he did apparently produce pay stubs for the period requested in the interrogatories. Appellant's most serious objections, then, emerge from the taking of "extra" evidence at the hearing in the form of additional pay stubs and the lack of any authentication of the admitted evidence in the record. The objections deserve consideration since that extra evidence, as is revealed by the transcript of the hearing, may have played some significant role in the court's assessment, discussed above, of the debtor's income.

Appellant deserves an opportunity to rebut the evidence in question (the extra pay stubs), or to challenge its authenticity, and the bankruptcy court upon remand should afford appellant such an opportunity.

Appellant also objects to the court's arguable failure to consider, or compare, the budget of the original Chapter 13 Plan with that of the amended plan.

At the hearing, appellant attempted to argue that the amended budget was *not* submitted in good faith because the original budget figures were escalated in an amended budget, and the escalation corresponded to the amount of income freed up by "cramming down" the second mortgagee. Appellant now argues that the court below erred in refusing to consider the original plan and differences between the original and the

amended plan in its assessment of "good faith."

This court thinks it clear that the bankruptcy court should consider every available relevant factor in assessing whether as a whole the Chapter 13 Plan is proposed in good faith. *See In re Rimgale,* 669 F.2d 426. The original plan may, under some circumstances, be such a relevant factor.

The record does raise some doubt about whether or not the bankruptcy court did consider the original plan and alterations in that plan. The court remarked at the hearing:

> I am looking at what his budget is *now.* His first budget is not the concern of the court, I am concerned with what he shows that the court is going to pass upon
> . . . .

(Emphasis added.) Appendix at 28A–29A.

In an abundance of caution, and because the record leaves some lingering uncertainty as to the scope of the bankruptcy judge's inquiry as to good faith, the court will remand for clarification of the basis of the court's findings that the plan was proposed in good faith. The court does not reach the question of the bankruptcy judge's overall view of the equity of the debtor's budget. We remand simply so that the bankruptcy court can explicitly consider the significance, if any, of the discrepancies between the first plan and the amended plan's budget on the question of "good faith." Similarly, we remand so that the court can afford the chance for the appellant to review and comment upon—and perhaps challenge the authenticity of—all of the evidence of income that the bankruptcy court considers in reaching the conclusion that the plan's stated income is accurate and fair and not violative of the good faith requirement of § 1325(a)(3).

On remand, the court might also consider in general any irregularities in the debtor's application that might bear on the question of "equitable intention and action"—for example, adequacy of submissions of material financial information.

V.

The appellant would have this court announce a list of factors that the bankruptcy court *must* consider in determining whether the proposed plan satisfies the good faith requirement.

The circuit court in *Rimgale* provided a partial list but abstained from constructing anything resembling an exhaustive list. The court in *Rimgale* thus stated:

> The following list, by no means exclusive, is intended to guide the bankruptcy judge's inquiry on remand:
>
> (1) Does the proposed plan state Rimgale's secured and unsecured debts accurately?
>
> (2) Does it state Rimgale's expenses accurately?
>
> (3) Is the percentage of repayment of unsecured claims correct?
>
> (4) If there are or have been deficiencies in the plan, do the inaccuracies amount to an attempt to mislead the bankruptcy court?
>
> (5) Do the proposed payments indicated "a fundamental fairness in dealing with one's creditors," *In re Beaver,* 2 B.R. 337, 340 (Bkrtcy.S.D.Cal.1980).

I doubt that this court can improve upon the *Rimgale* court's list of appropriate factors, nor upon the prudence of the *Rimgale* court in not attempting to supply an exhaustive list.

The appellant registers concern that factor # (2)—"does the plan state the (debtor's) expenses accurately?"—is difficult to apply without the articulation of some standard that *must* bind the bankruptcy judge. For example, appellant suggests that this district court impose upon the bankruptcy judge one of several Federal Bureau of Labor Standards' expense budgets. The court declines the invitation to establish any such formula by which the bankruptcy judge must evaluate the fairness of Chapter 13 Plan budgets. Such a rule would invade the province and trespass upon the experience of that court of equity, and we think

imprudently interfere with its ability and flexibly to analyze and act to achieve equity and carry out the liberal purposes of Chapter 13.

In sum, this court affirms the ruling below that a zero payment to non-secured creditors does not, standing alone, transgress the good faith requirement of 1325(a)(3), and we remand for further proceedings consistent with the reasoning of this opinion.[2]

[2.] The appellant's statement of issues for appeal raise two matters not explicitly settled by the opinion. First, can the Plan and Budget of a Chapter 13 Bankruptcy Petition be amended on the basis of new evidence introduced at the time of the confirmation hearing without a formal amendment being filed with prior notice to the trustee and all creditors? The court thinks its resolution makes it unnecessary to decide this question.

Second, is the attorney for an objecting creditor entitled to attorney's fees if the objection proves successful, with the result that the Chapter 13 Plan is amended to provide additional funds for all unsecured creditors? Since the court only remands for clarification and further proceedings, we cannot know whether the objecting creditor will so prevail. Hence, we do not reach this issue.